# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| STREAMLINE AUTOMATION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 20-1560-CFC |
| v. | ) | |
| | ) | |
| IFIT, INC., | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF STREAMLINE AUTOMATION, LLC'S
## AND DEFENDANT IFIT, INC.'S
## JOINT CLAIM CONSTRUCTION BRIEF

## <u>TABLE OF CONTENTS</u>

I.    Introduction ........................................................................................................ 1

    A.    Plaintiff's Opening Position ................................................................. 1

    B.    Defendant's Answering Position .......................................................... 1

II.    Agreed-Upon Constructions ............................................................................... 3

    A.    "said controller" .................................................................................. 3

III.    Disputed Constructions ...................................................................................... 3

    A.    Dispute 1: "electric motor" ................................................................. 3

        1.    Plaintiff's Opening Position ..................................................... 3

        2.    Defendant's Answering Position ............................................... 7

        3.    Plaintiff's Reply Position ......................................................... 8

        4.    Defendant's Sur-Reply Position ............................................. 10

    B.    Dispute 2: The Resistance Terms ...................................................... 12

        1.    Plaintiff's Opening Position ................................................... 12

        2.    Defendant's Answering Position ............................................. 18

        3.    Plaintiff's Reply Position ....................................................... 30

        4.    Defendant's Sur-Reply Position ............................................. 39

    C.    Dispute 3: "via software and without a mechanical change." ............ 44

        1.    Plaintiff's Opening Position ................................................... 44

        2.    Defendant's Answering Position ............................................. 47

        3.    Plaintiff's Reply Position ....................................................... 50

        4.    Defendant's Sur-Reply Position ............................................. 52

    D.    Dispute 4: "means for communication . . ." ...................................... 54

|  |  | 1. | Plaintiff's Opening Position | 55 |
|  |  | 2. | Defendant's Answering Position | 58 |
|  |  | 3. | Plaintiff's Reply Position | 63 |
|  |  | 4. | Defendant's Sur-Reply Position | 64 |
|  | E. | Dispute 5: "external video game system" | | 67 |
|  |  | 1. | Plaintiff's Opening Position | 67 |
|  |  | 2. | Defendant's Answering Position | 69 |
|  |  | 3. | Plaintiff's Reply Position | 72 |
|  |  | 4. | Defendant's Sur-Reply Position | 74 |
|  | F. | Dispute 6: The "iso-inertial" Terms | | 76 |
|  |  | 1. | Plaintiff's Opening Position | 76 |
|  |  | 2. | Defendant's Answering Position | 77 |
|  |  | 3. | Plaintiff's Reply Position | 80 |
|  |  | 4. | Defendant's Sur-Reply Position | 82 |
|  | G. | Dispute 7: "moves in a direction opposite said first direction" | | 83 |
|  |  | 1. | Plaintiff's Opening Position | 83 |
|  |  | 2. | Defendant's Answering Position | 85 |
|  |  | 3. | Plaintiff's Reply Position | 89 |
|  |  | 4. | Defendant's Sur-Reply Position | 90 |
| IV. | Conclusion | | | 93 |
|  |  | 1. | Plaintiff's Opening Position | 93 |

ME1 39227200v.1

# TABLE OF AUTHORITIES

## CASES

*3M Innovative Properties Co. v. Tredegar Corp.*,
  725 F.3d 1315 (Fed. Cir. 2013) ..............................................................84

*Advanced Cardiovascular Systems, Inc. v. Medtronic, Inc.*,
  265 F.3d 1294 (Fed. Cir. 2001) ..............................................................34

*AIP Acquisition LLC v. Cisco Systems, Inc.*,
  714 F. App'x 1010 (Fed. Cir. 2017)........................................................34

*American Piledriving Equipment, Inc. v. Geoquip, Inc.*,
  637 F.3d 1324 (Fed. Cir. 2011) ............................................... 37, 85, 89

*Baxalta Inc. v. Genentech, Inc.*,
  972 F.3d 1341 (Fed. Cir. 2020) ................................................................6

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,
  616 F.3d 1249 (Fed. Cir. 2010) ..............................................................47

*Bell Atlantic Network Services, Inc. v. Covad Communications Group, Inc.*,
  262 F.3d 1258 (Fed. Cir. 2001) ..............................................................39

*C.R. Bard, Inc. v. M3 Systems, Inc.*,
  157 F.3d 1340 (Fed. Cir. 1998) ..............................................................57

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*,
  224 F.3d 1308 (Fed. Cir. 2000) .........................................................8, 11

*Clare v. Chrysler Group LLC*,
  819 F.3d 1323 (Fed. Cir. 2016) ..............................................................46

*Cohesive Technologies, Inc. v. Waters Corp.*,
  543 F.3d 1351 (Fed. Cir. 2008) ..............................................................90

*Cordis Corp. v. Boston Scientific Corp.*,
  658 F.3d 1347 (Fed. Cir. 2011) ..............................................................22

iii

*Digital Biometrics, Inc. v. Identix, Inc.*,
 149 F.3d 1335 (Fed. Cir. 1998) ....................................................................78

*Douglas Dynamics, LLC v. Buyers Products Co.*,
 717 F.3d 1336 (Fed. Cir. 2013) ....................................................................18

*Duncan Parking Technologies, Inc. v. IPS Group, Inc.*,
 914 F.3d 1347 (Fed. Cir. 2019) ....................................................................77

*Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*,
 279 F.3d 1022 (Fed. Cir. 2002) ....................................................................57

*ERBE Elektromedizin GmbH v. International Trade Commission*,
 566 F.3d 1028 (Fed. Cir. 2009) ....................................................................16

*Fonar Corp. v. Gen. Elec. Co.*,
 107 F.3d 1543 (Fed.Cir.1997) ......................................................................59

*Furnace Brook LLC v. Overstock.com, Inc.*,
 230 F. App'x 984 (Fed. Cir. 2007) ..............................................................59

*Gentry Gallery, Inc. v. Berkline Corp.*,
 134 F.3d 1473 (Fed. Cir. 1998) ....................................................................85

*Hill-Rom Services, Inc. v. Stryker Corp.*,
 755 F.3d 1367 (Fed. Cir. 2014) ............................................................ 37, 38

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
 802 F.2d 1367 (Fed. Cir. 1986) ............................................................ 10, 11

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
 849 F.3d 1034 (Fed. Cir. 2017) ....................................................................82

*Imaginal Systematic, LLC v. Leggett & Platt, Inc.*,
 805 F.3d 1102 (Fed. Cir. 2015) ...............................................................6, 10

*Indivior Inc. v. Dr. Reddy's Lab'ys, S.A.*,
 930 F.3d 1346 (Fed. Cir. 2019) ......................................................................8

*Johnson Worldwide Associates, Inc. v. Zebco Corp.*,
 175 F.3d 985 (Fed. Cir. 1999) ......................................................................18

iv

*Laitram Corp. v. Morehouse Indus., Inc.*,
    143 F.3d 1456 (Fed. Cir. 1998) .............................................................. 23, 40, 41

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ......................................................................37

*Merck & Co. v. Teva Pharmaceuticals USA, Inc.*,
    347 F.3d 1367 (Fed. Cir. 2003) ...................................................................68

*Noah Sys., Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012) ............................................................ 61, 65

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005) ...................................................................57

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008) ...................................................................74

*Regents of University of Minnesota v. AGA Medical Corp.*,
    717 F.3d 929 (Fed. Cir. 2013) .....................................................................33

*ResQNet.com, Inc. v. Lansa, Inc.*,
    346 F.3d 1374 (Fed. Cir. 2003) ............................................................ 23, 33

*Rosco, Inc. v. Velvac Inc.*,
    C.A. No. 11-117-LPS, 2012 WL 6028239 (D. Del. Dec. 4, 2012).............. 18, 84

*Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC*,
    824 F.3d 999 (Fed. Cir. 2016) .............................................................. 25, 35, 41

*Saffran v. Johnson & Johnson*,
    712 F.3d 549 (Fed. Cir. 2013) .............................................................. 59, 63, 64

*Schoenhaus v. Genesco, Inc.*,
    440 F.3d 1354 (Fed. Cir. 2006) ...................................................................47

*SkinMedica, Inc. v. Histogen Inc.*,
    727 F.3d 1187 (Fed. Cir. 2013) ...................................................................39

*Thorner v. Sony Comput. Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ...................................................................22

v

*T-Jat Systems 2006 Ltd. v. Expedia, Inc.*,
    No. 16-cv-581-RGA, 2019 WL 3944014 (D. Del. Aug. 21, 2019) ....................84

*Trustees of Columbia University in City of New York v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) ...........................................................................57

*Verizon Services Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) ...........................................................................16

*Wasica Finance GmbH v. Continental Automotive Systems, Inc.*,
    853 F.3d 1272 (Fed. Cir. 2017) ...........................................................................84

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) ...........................................................................59

*X2Y Attenuators, LLC v. Int'l Trade Comm'n*,
    757 F.3d 1358 (Fed. Cir. 2014) ...........................................................................22

## STATUTES

35 U.S.C. § 102 ........................................................................................................52

35 U.S.C. § 103 ........................................................................................................52

35 U.S.C. § 112(c) ...................................................................................................51

## REGULATIONS

37 C.F.R. § 1.53(b)(2) .............................................................................................32

**TABLE OF EXHIBITS**

| Number | Description |
|---|---|
| Streamline-1 | U.S. Patent No. 9,144,709 |
| Streamline-2 | U.S. Patent No. 9,272,186 |
| Streamline-3 | U.S. Patent No. 9,586,091 |
| Streamline-4 | Excerpt, M.J. Clugston ed., *The Penguin Dictionary of Science* (3d ed. 2009) |
| Streamline-5 | Excerpt, Nick Jelley, *A Dictionary of Energy Science* (2019) |
| Streamline-6 | Excerpt, Keith Dinwiddie, *Basic Robotics* (2016) |
| Streamline-7 | Excerpt, Austin Hughes and Bill Drury, *Electric Motors and Drives: Fundamentals, Types, and Applications* (4th ed. 2013) |
| Streamline-8 | Excerpt, Appin Knowledge Solutions, *Robotics* (2007) |
| Streamline-9 | Excerpt, Phillip John McKerrow, *Introduction to Robotics* (1991) |
| Streamline-10 | Excerpt, Stan Gibilisco ed., *The Illustrated Dictionary of Electronics* (8th ed. 2001) |
| Streamline-11 | Excerpt, Prosecution History of U.S. Patent No. 9,272,186 |
| Streamline-12 | U.S. Patent No. 8,360,935 |
| Streamline-13 | Excerpt, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2011) |
| Streamline-14 | Excerpt, *The American Heritage Dictionary of the English Language* (5th ed. 2011) |
| Streamline-15 | Excerpt, Prosecution History of U.S. Application No. 12/545,324 |
| Streamline-16 | Excerpt, *Gem Collins Dictionary* (2012) |
| Streamline-17 | Rebuttal Declaration of Dr. Carl Nelson Regarding Claim Construction |
| Streamline-18 | Excerpt, Prosecution History of U.S. Patent No. 9,144,709 |
|  |  |
| iFIT-1 | U.S. Patent No. 9,144,709 |
| iFIT-2 | U.S. Patent No. 9,272,186 |
| iFIT-3 | U.S. Patent No. 9,586,091 |
| iFIT-4 | Report of Expert Opinion for Markman Hearing of Scott Ganaja |
| iFIT-5 | Excerpt, Prosecution History of U.S. Patent No. 9,272,186 |
| iFIT-6 | U.S. Patent No. 8,360,935 ("Olsen") |
| iFIT-7 | Excerpt, Prosecution History of U.S. Patent Application No. 12/545,324 |
| iFIT-8 | Excerpt, Prosecution History of U.S. Patent Application No. 12/545,324 |

| Number | Description |
|---|---|
| iFIT-9 | Excerpt, Plaintiff's Disclosure of Asserted Claims and Infringement Contentions, Exhibit A |
| iFIT-10 | Excerpt, Prosecution History of U.S. Patent Application No. 12/545,324 |
| iFIT-11 | Oxford Advanced Learner's Dictionary |
| iFIT-12 | Oxford American Dictionary and Thesaurus |

ME1 39227200v.1

## I.      Introduction

### A.      Plaintiff's Opening Position

Streamline Automation, LLC, holds patents covering technology that enables remote secondary users and video game systems to interact with and control users' exercise systems: U.S. Patent No. 9,144,709; U.S. Patent No. 9,272,186; and U.S. Patent No. 9,586,091.[1] iFIT, Inc. infringes these patents, and the parties seek construction of eight groups of claim terms.

For each, iFIT seeks to manufacture noninfringement positions in the guise of claim construction, injecting limitations unsupported by the intrinsic record and ignoring the patents' clear disclosure. As discussed below, the evidence supports Streamline's proposed constructions, and Streamline requests that the Court construe the terms accordingly.

### B.      Defendant's Answering Position

The asserted patents in this case (all related in the same patent family) share nearly identical written descriptions and sets of drawings. While the patents appear to share, or attempt to share, much of the same patent family, the claims of the '091

---

[1] The '091 patent is a continuation of the '186 patent and shares a substantively identical specification. The parties have agreed to cite only the '186 specification where a term appears in both patents. While similar, the '186 specification is not identical to the '709 specification, and Streamline has cited both, even for parallel citations.

and '186 patents are directed to slightly different uses for the motor-supplied resistance device as compared to the claims of the '709 patent.

The '709 patent contains method claims that describe use of "an apparatus using a computer configured exercise system equipped with an electric motor to provide physical resistance" (Abstract) that is "configurable for linkage to a game console and/or as an input device to a video game." ('709 patent 3:34–36).

The '186 and '091 patents share identical specifications. The claims in these patents are method claims that describe use of "an apparatus using a computer configured exercise system equipped with an electric motor to provide physical resistance to user motion" (Abstract '186 and '091 patents) that is "configurable for linkage with a secondary user." ('091 patent 3:38–40)

The commonalities between the specifications for the asserted patents describe to one of skill in the art an exercise device that uses an electric motor to supply or provide variable resistance to an exercise element, such as a pull cable or rotational crank. The various claims to the asserted patents add limitations regarding how and when that variable resistance is adjusted or add limitations related to linking the motorized resistance device to a secondary user or to a video game system.

## II.    Agreed-Upon Constructions

### A.    "said controller"

| Claim Term and Claims | Agreed Construction |
|---|---|
| "said controller" '709 patent claim 7. | A controller. |

## III.    Disputed Constructions

### A.    Dispute 1: "electric motor"

| Claim Term and Claims | Streamline | iFIT |
|---|---|---|
| "electric motor" '709 patent claims 1, 3, 5, 6, 8, 10, 12. '186 & '091 patents claims 1, 2, 7, 8, 10, 13. | An electrical machine that converts electrical energy to mechanical energy. | An electrical machine that converts electrical energy to mechanical energy that is distinct from an electric servo assist/resist motor, a variable speed motor, or an actuator. |

### 1.    Plaintiff's Opening Position

#### i.    The claimed "electric motor" is any electric motor.

Each asserted claim requires an "electric motor." *See, e.g.*, '709 patent at claim 1; '186 patent at claim 1; '091 patent at claim 1. The claims recite this basic term without restriction, requiring only that the electric motor supply resistance to mechanical movements of the user interface. '709 patent at claim 1 ("electric motor provides physical resistance to movement of said user interface"), claim 12 (same); '186 patent at claim 1 ("electric motor configured to provide a resistive force to said primary user interface"); '091 patent at claim 1 (same).

ME1 39227200v.1

The specifications similarly describe the "electric motor" supplying "an assistive and/or resistive force to movement of the user interface." '709 patent at 4:30-32; '186 patent at 4:44-47 (same); *see also* '709 patent at 4:4-12 ("[A]n electric motor configured to supply a movement force to movement of the user interface element, . . . the movement force is configured to provide . . . (1) a resistive force against movement . . . and (2) an assistive force aiding movement . . . ."); '186 patent at 4:19-27 (same); '709 patent at 4:44-47 ("Resistance to movement supplied by the electric motor optionally varies . . ."); '186 patent at 4:57-61 (same); '709 patent at 7:5-7 ("an electric motor 240 configured to provide resistance to movement of the weightlifting bar"); '186 patent at 7:19-21 (same).

The specifications teach that this resistance is applied to mechanical movements (and, accordingly, requires mechanical energy). They explain that "[m]ovement of the weightlifting bar 220 is resisted by the electric motor 240. For example, the electric motor 240 provides a resistive force to rotation of the cable spool 242, which transfers the resistive force to the resistance cable 230 and to the weightlifting bar 220 pulled on by the subject." '709 patent at 7:17-22; '186 patent at 7:30-36 (same).

The specifications similarly teach that the motor must convert electrical energy to mechanical energy. They contrast mechanical "power generation system[s] where a user pedals a crank and generates power" with the disclosed

4

system, which "uses an electric motor to provide a resistance against which the person exercising needs to exert force." '709 patent at 10:63-67; '186 patent at 10:66-11:3 (same).

Nothing in the prosecution history alters the understanding that the electric motor is a machine that converts electrical energy to mechanical energy. And extrinsic evidence confirms that an electric motor is "[a] device for turning electrical potential energy into mechanical kinetic energy." Ex. Streamline-4 at 201; Ex. Streamline-5 at 1 ("A device that transforms electrical energy into kinetic energy.").

### ii. iFIT seeks to inject limitations unsupported by the intrinsic record.

iFIT concedes that an electric motor is "[a]n electrical machine that converts electrical energy to mechanical energy," but it seeks to exclude classes of electric motors—electric servo assist/resist motors, variable speed motors, and actuators—from the scope of "electric motor." *See* D.I. 39 at 2.

iFIT bases its construction on a single sentence from the specifications. *Id.* On review, the cited sentence states simply that the resistance system may compromise any or all of eight components—"[t]he resistance system comprises: a subject interface, software control, a controller, an electric motor, an electric servo assist/resist motor, a variable speed motor, an actuator, and/or a subject sensor." '709 patent at 4:65-5:1; '186 patent at 5:11-14 (same). It does not define "electric motor"

5

to exclude any of the other listed components—indeed, the sentence is conspicuously absent from the patents' "Definitions" section. *See* '709 patent at 5:27-41; '186 patent at 5:40-54. Instead, it offers a choice—use an electric motor and/or one of the specific types of motors listed. Such a general statement is not lexicography. *See Baxalta Inc. v. Genentech, Inc*., 972 F.3d 1341, 1347 (Fed. Cir. 2020) (rejecting assertion that "generalized introduction" acted as a definition in view of "the context of the remainder of the written description and the claims"); *Imaginal Systematic, LLC v. Leggett & Platt, Inc*., 805 F.3d 1102, 1109-10 (Fed. Cir. 2015) (rejecting argument that "vision guidance system" excluded particular systems where "[n]othing in the claim language purports to restrict the term . . . to one particular system" and "the patentee could have specifically disclaimed a particular vision guidance system . . . but did not do so").

Further, one of ordinary skill[2] would have recognized that iFIT's proposed construction departs from the ordinary meaning of "electric motor." A POSA would have understood the overlapping relationship of "electric motors," "electric servo assist/resist motors," "variable speed motors," and "actuators." A "servo" motor is a

---

[2] A person of ordinary skill in the art (POSA) would have had a minimum of a bachelor's degree in Electrical Engineering, Physics, Computer Science, Mechanical Engineering, or an equivalent subject, with at least two years of industry experience in design, engineering, or a similar field. More experience would compensate for less formal education, and vice versa.

6

type of electric motor that provides "continuous rotation." Ex. Streamline-6 at 91 (discussing in the context of direct current (DC) robots); Ex. Streamline-7 at 136 ("there is no sharp dividing line between servo motors and ordinary motors"). Variable speed motors are a class of electric "stepper motors" that run based on the polarity of voltage (electricity) applied to their coils. Ex. Streamline-8 at 144, 148-49. Though these motors operate differently, both are "electric motors." Likewise, an actuator is an electric motor. Ex. Streamline-9 at 101 (noting an electric actuator may be a "DC motor[]" or a "stepper motor[]"), 106 ("Two types of electric motors are . . . stepper motors and direct current (d.c.) motors."); *see also* Ex. Streamline-10 at 13 (defining "actuator" as "[a]n electromechanical device that uses electromagnetism to produce a . . . thrust for mechanical work"). The patents express no preference for any specific type of electric motor, and iFIT's proposed construction unjustifiably narrows the scope of "electric motor."

### 2.    Defendant's Answering Position

"The resistance system comprises: a subject interface, software control, a controller, an electric motor, an electric servo assist/resist motor, a variable speed motor, an actuator, and/or a subject sensor." '709 patent at 4:65–5:1; '186 patent at 5:11–14. This portion of the patent's specifications lists different devices which may be used in a resistance system. Both "controller" and "electric motor" are claimed. According to Streamline, "electric motor" cannot exclude "controller." Joint Brief

7

at 5–6. However, different terms must have different meanings. *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) (use of these different terms in the claims connotes different meanings). Therefore, if two items in the list must have different meanings, then all items of the list whether claimed or not, should be provided separate meanings as the patent does not state that the terms are synonymous, but rather different structures.

Because only the electric motor and controller are claimed, the electric servo, assist/resist motor, variable speed motor, and actuator represent unclaimed embodiments and cannot be subsumed under the definition of "electric motor." *Indivior Inc. v. Dr. Reddy's Lab'ys, S.A.*, 930 F.3d 1325, 1346 (Fed. Cir. 2019) ("When a patentee discloses subject matter but does not claim it, the patentee dedicates the unclaimed subject matter to the public and cannot recapture it through the doctrine of equivalents"). Here, Streamline attempts to recapture unclaimed subject matter through claim construction rather than the doctrine of equivalents in the context of infringement and the Court should not allow it. Accordingly, iFIT's construction should be adopted.

### 3.    Plaintiff's Reply Position

As previously explained, "electric motor" should be construed to mean an electrical machine that converts electrical energy to mechanical energy. *Supra* § III.A.1.i.

8

iFIT does not dispute that an electric motor is "[a]n electrical machine that converts electrical energy to mechanical energy." D.I. 39 at 2. But iFIT seeks to exclude certain electric motors from the scope of the claims. It argues that in stating that "[t]he resistance system comprises: a subject interface, software control, a controller, an electric motor, an electric servo assist/resist motor, a variable speed motor, an actuator, and/or a subject sensor," the patents redefine "electric motor" to exclude electric servo assist/resist motors, variable speed motors, and actuators, because each item in the sentence must have a distinct meaning. *See supra* § III.A.2; '709 patent at 4:65-5:1; '186 patent at 5:11-14 (same).

But contrary to iFIT's argument, *supra* § III.A.2, the issue is not whether each of an electric servo assist/resist motor, a variable speed motor, and an actuator is the same, but rather whether each of these motors is an "electric motor." A variable speed motor may be different from an actuator. *See, e.g.*, Ex. Streamline-8 at 144, 148-49; Ex. Streamline-9 at 101. And an electric motor may be either or neither. *See, e.g.*, Ex. Streamline-9 at 106; *supra* § III.A.1.ii (discussing types of electric motors). The cited sentence, however, does not redefine "electric motor." It merely notes that the system may compromise any or all of the eight listed components, including the specific electric motors that are listed. *See* '709 patent at 4:65-5:1; '186 patent at 5:11-14.

ME1 39227200v.1

Though iFIT seeks to characterize an electric servo assist/resist motor, a variable speed motor, and an actuator as "unclaimed embodiments," *supra* § III.A.2, it does not contest that a POSA would have recognized that each of an electric servo assist/resist motor, a variable speed motor, and an actuator is a type of electric motor, *see generally id*. And it points to nothing in the patents that restricts the type of electric motor that may be used in the claimed inventions. *See id.*; *Imaginal Systematic, LLC v. Leggett & Platt, Inc*., 805 F.3d 1102, 1109-10 (Fed. Cir. 2015) (rejecting argument that "vision guidance system" excluded particular systems where "[n]othing in the claim language purports to restrict the term . . . to one particular system"). While iFIT faults the patents for not expressly stating that an "electric motor" may include any of an electric servo assist/resist motor, a variable speed motor, and an actuator, *supra* § III.A.2, "a patent need not teach, and preferably omits, what is well known in the art," *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986).

### 4.    Defendant's Sur-Reply Position

The dispute with regards to "electric motor" revolve around a single line from the specification of the asserted patents: "[t]he resistance system comprises: a subject interface, software control, a controller, an electric motor, an electric servo assist/resist motor, a variable speed motor, an actuator, and/or a subject sensor." '709 patent at 4:65–5:1; '186 patent at 5:11–14 (same). Does this sentence merely

10

disclose examples of the claimed "electric motor" (Streamline's position) or does it define the claimed "electric motor" by citing to and excluding generic motors (such as resistance motors or actuators) from the scope of the claimed "electric motor" (iFIT's position)?

Though the cited sentence does not specifically define "electric motor," it does distinguish the claimed "electric motor" from an electric servo assist/resist motor, a variable speed motor, or an actuator. iFIT's proposed construction provides meaning to assist the trier in making the distinction contemplated by the applicant and is supported by Federal Circuit precedent. *CAE Screenplates*, 224 F.3d at 1317 (use of different terms connotes different meanings).

Moreover, Streamline's position ignores the cited language in the specification. Streamline argues that an electric servo assist/resist motor, a variable speed motor, and an actuator are different types of generic electric motors. Joint Brief at 10. The cited specification does not list these devices as examples of the claimed "electric motor;" rather, these examples must have different meanings from the claimed "electric motor" because they are listed by the applicant as devices that are different than the "electric motor." *Hybritech*, 802 F.2d at 1384 ("a patent need not teach, ***and preferably omits***, what is well known in the art.") Therefore, the only reason for the applicant to list an electric servo assist/resist motor, a variable speed

motor, and an actuator in the specification is that these examples of generic motors are different from and not mere examples of, the claimed "electric motor."

**B.      Dispute 2: The Resistance Terms**

| Claim Term and Claims | Streamline | iFIT |
|---|---|---|
| "electric motor provides physical resistance to movement of said user interface through said cable." '709 patent claims 1, 12. | Plain and ordinary meaning. | Plain and ordinary meaning in light of the intrinsic evidence, i.e., the electric motor directly supplies and is the source of the physical resistance via a cable. |
| "electric motor configured to provide a resistive force" '186 & '091 patents claim 1. | Plain and ordinary meaning. | Plain and ordinary meaning in light of the intrinsic evidence, i.e., the electric motor directly supplies and is the source of the resistive force via a cable. |
| "resistive force supplied by said electric motor" '186 & '091 patents claims 1, 2, 7, 10, 13. | Plain and ordinary meaning. | Plain and ordinary meaning in light of the intrinsic evidence, i.e., the electric motor directly supplies and is the source of the resistive force via a cable. |

**1.      Plaintiff's Opening Position**

**i.      The claims require the electric motor to supply resistance.**

The claimed motor must provide resistance to movement of the user interface. '709 patent at claim 1 ("electric motor provides physical resistance to movement of said user interface"); '186 patent at claim 1 ("electric motor configured to provide a resistive force to said primary user interface"); '091 patent at claim 1 (same). The

parties dispute how this interaction must be effected, but the claims do not limit how the motor provides resistance. Nor do they require any particular configuration of the motor and user interface.

The specifications provide examples of how the motor and user interface interact, emphasizing that each illustration is "only one of many possible forms" of the disclosed exercise system. '709 patent at 12:9-12; '186 patent at 12:12-15 (same).

In one such example—Figure 2—electric motor 240 is "configured to provide resistance to movement of the weightlifting bar 220 through the resistance cable 230." '709 patent at 7:5-7; '186 patent at 7:19-21 (same). For example, motor 240, in blue, "provides a resistive force to rotation of the cable spool 242 [red], which transfers the resistive force to the resistance cable 230 [orange] and to the weightlifting bar 220 [green]." '709 patent at 7:18-22; '186 patent at 7:31-36 (same).

ME1 39227200v.1



FIG. 2

'709 patent at Fig. 2 (annotated); '186 patent at Fig. 2 (annotated). Thus, the resistive force is transferred from motor 240 to cable spool 242, from cable spool 242 to cable 250, and from cable 250 to bar 220. '709 patent at 7:18-22; '186 patent at 7:31-36. The specifications further teach that the electric motor may also transfer force to the cable even more indirectly, through a gearbox. '709 patent at 7:22-25; '186 patent at 7:36-39.

Similarly, in discussing the embodiments of Figures 4 and 6, the specifications explain that the system may include "motor 240 [blue] and/or motor controlled wheel 462 [red]" connected by cable(s) to the user interface(s) (green). '709 patent at 12:4-12; '186 patent at 12:7-15 (same).

14



FIG. 4                                          FIG. 6

'709 patent at Figs. 4, 6 (annotated); '186 patent at Fig. 4, 6 (annotated). The patents also explain, however, that cable 442 of Figure 4 may be "affixed to the crank assembly 440 and to the motor 240," contemplating a more direct connection between the motor and the user interface. '709 patent at 10:54-55; '186 patent at 10:57-58 (same); *see also* '709 patent at 4:30-32 ("An electric motor is configured to supply . . . resistive force . . . such as via a cable or a linkage."); '186 patent at 4:44-47 (same).

In short, neither the claims nor the specifications mandate any configuration of the electric motor and user interface—the motor must simply provide resistance. And nothing in the prosecution histories disturbs this plain meaning.

ME1 39227200v.1

### ii.     iFIT seeks to limit the motor to one that "directly" supplies and "is the source of" resistance.

iFIT seeks to narrow the claims by requiring that the motor "directly supplies" and "is the source of the resistive force." D.I. 39 at 3-5. But the claims and specifications nowhere state that the motor "directly supplies" or is the "source" of resistance. *See generally* '709 patent; '186 patent. To the contrary, as detailed above, the patents describe various configurations in which the motor supplies resistance to the cable and user interface *indirectly*, through a spool, gearbox, or wheel. *See, e.g.*, '709 patent at 7:18-25, 12:4-12; '186 patent at 7:31-39, 12:7-15. These embodiments counsel against iFIT's proposed construction. *See ERBE Elektromedizin GmbH v. Int'l Trade Comm'n*, 566 F.3d 1028, 1034-37 (Fed. Cir. 2009) (rejecting proposed claim construction as inconsistent with patent's figures and written description); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification.").

The prosecution history of the '186 patent confirms that the applicant and examiner understood that the electric motor could indirectly provide resistance. Original claim 1 of the '186 patent recited "said electric motor configured to provide a resistive force to said primary user interface." Ex. Streamline-11 at Streamline-00001511. In an Office Action, the examiner found this limitation present in U.S. Patent No. 8,360,935 ("*Olsen*"). *Id.* at Streamline-00001413. Notably, *Olsen*

16

describes indirect force transfer from motor 11 (blue) to a movable resistance element 23 (green) via "a first transmission belt 37," "a second transmission belt 41," and "cord 27." Ex. Streamline-12 at 6:38-46, 10:4-34, Fig. 1.



Fig. 1

*Id.* at Fig. 1 (annotated). The examiner found that this configuration meets the claim limitation, Ex. Streamline-11 at Streamline-00001413, and the applicant did not disagree. *See id.* at Streamline-00001382.

iFIT's proposal to inject "directly supplies" and "is the source of the resistive force" finds support in neither the patents' specifications nor their prosecution histories. And in similar circumstances, the Federal Circuit has rejected attempts to

17

add such modifiers to a claim. *See Douglas Dynamics, LLC v. Buyers Prods. Co*., 717 F.3d 1336, 1342 (Fed. Cir. 2013) (reversing construction of "connected to" that required direct connection, noting "[t]he ordinary meaning of 'connected to' encompasses indirect linkages"); *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989, 992 (Fed. Cir. 1999) (ruling "coupled" was not limited to "mechanically coupled" where claims did not literally require mechanical or physical coupling); *see also Rosco, Inc. v. Velvac Inc*., C.A. No. 11-117-LPS, 2012 WL 6028239, at *7 (D. Del. Dec. 4, 2012) (rejecting proposal to limit term to "direct" attachment where "[t]he specification does not specify that the attachment must only be by 'direct' attachment; nor does the prosecution history support the addition of such a limitation"). Streamline asks the Court to similarly reject iFIT's proposed construction here.

### 2.    Defendant's Answering Position

#### i.    The prosecution history of the streamline asserted patents and other prior art support iFIT's construction.

iFIT's claim construction is correct because it aligns with how one of skill in the art plainly understands the scope of the claims for an electric motor providing or supplying the resistance/resistive forces. Ex. iFIT-4 at iFIT APPX 000066, 000071. One of skill in the art recognizes that there are many different resistance mechanisms for providing resistance in an exercise device, and the asserted patents are directed

18

to a certain type of resistance mechanisms *Id*. Streamline's construction, as evidenced by its infringement positions in this case, seeks to encompass a broad array of resistance mechanisms, such as the magnetic braking used in all of the accused products *Id.* This does not align with the plain meaning of one of skill in the art.

To support their construction, Streamline argues that the intrinsic record supports its position that motor-supplied resistance should be read broadly on any type of resistance device. Streamline points to prior art cited in an examiner's rejection. Joint Brief at 16–17. There, the examiner argued that an electric motor providing force to a user interface is disclosed in U.S. Patent No. 8,360,935 ("Olsen"). Ex. iFIT-5 at iFIT APPX 000091 ('186 Prosecution History).



Fig. 1

ME1 39227200v.1

Joint Brief at 17.

Olsen disclosed an electric motor providing resistance via a cable to a resistance element, just as is claimed in the asserted patents. *Id.* at 16–17. Streamline argues that because the applicant said nothing when the examiner argued that Olsen met the claim limitation, that it is entitled to a broader reading that captures other types of resistance mechanisms where the motor does not supply the resistance. The electric motor in Olsen "generates the resistance." Ex. iFIT-6 (Olsen at 2:58; see also 4:10–12; 7:3–6). The examiner and applicant both understood that Olsen and the patentee's own claims disclose motor-supplied resistance, which is why the cited art focused on that type of resistance mechanism. The intrinsic record for the '186 patent supports iFIT's construction and does not suggest in any way an expansion of scope to resistance mechanisms where the motor is not supplying the resistive force.

In addition to the cited art lending support to iFIT's plain understanding of the claim scope as one of skill in the art, applicant also made statements during the prosecution of U.S. Patent Application No. 12/545,324 ("'324 application") that confirm the patentee's invention is directed to motor-suppled resistance. The '324 application is a related application to which the asserted patents attempt to claim priority and it is "incorporated herein in [it]s entirety" in each of the asserted patents.

In the '324 application, the examiner argued that a prior art reference, U.S. Patent No. 6,375,598 (Frame), disclosed an electric drive (comprising an electric

motor) applying a resistance to an interactive element. Ex. iFIT-7 at iFIT APPX 000112 ('324 Application Prosecution History). The applicant argued in response that:

> Frame discloses an apparatus comprising a force resistor 38 that resists forward motion of a pedal (col. 8, lines 20-28 and 38-40; col. 9, lines 20-32; col. 10, lines 41-57; col. 11, lines 25-39). Column 11, line 54, through column 14, line 40, describes load connection linkage mechanisms that are manipulated to change the force required from a user to move an interactive element. All of these mechanisms are coupled to ***pneumatic cylinders that apply a resistance*** to an interactive element. ***The apparatus disclosed by Frame appears, therefore, to be limited to providing only a resistance through pneumatic cylinders***.
>
> …
>
> ***Frame does not disclose or suggest an electric motor applying a force and/or a resistance to an interactive element*** as recited in claim 1. Frame does not disclose any means of providing a resistance other than pneumatic cylinders. ***Electric motors are mentioned by Frame only as driving a hydraulic or gear-driven jack (col. 10, lines 11-28). A jack may be used to change the compression ratio of a pneumatic cylinder*** (col. 13, lines 23-24; col. 20, lines 50-61). Adjustment of the compression ratio of the loading device (pneumatic cylinder) is accomplished by adjustably positioning a portion, such as the cylinder housing, relative to another portion, such as the piston, of the fluid working loading device (col. 21, lines 6-8). Applicant respectfully submits that the disclosures regarding the use of electric motors in Frame may not reasonably be interpreted as disclosing an exercise apparatus in which the interactive element and electric drive unit are physically coupled such that the electric drive unit applies a force and/or a resistance to the at least one interactive element. Furthermore, this arrangement

21

> appears to be incapable of providing assistance to a user by way of a force applied to interactive element rather than a resistance. It appears that the only force applied to an interactive element during the use of the Frame apparatus is applied by the user.

(*Id.* at iFIT APPX 000111).

Applicant argued in the prosecution of the '324 application that the electric motor *must* be understood as the source of the resistance. Frame taught that a motorized part was involved in driving other mechanisms and that the resistance was provided through pneumatic cylinders.

Applicant made this argument in a related application in an attempt to avoid prior art and to clarify the scope of its invention was directed to a motor-supplied resistance device, not a device with pneumatic resistance. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (plain and ordinary meaning does not apply when the patentee disavows the full scope of a claim term either in the specification or during prosecution.) Even though the statement was made in a prior application, it is still part of the intrinsic record the Court must consider, and any disclaimer regarding the scope of the disclosed invention in a related patent application can have equal effect. *Cordis Corp. v. Boston Sci. Corp.,* 658 F.3d 1347, 1356 n.5 (Fed. Cir. 2011) ("[A] disclaimer in the parent application carries forward into the construction of the same claim term in the child."); *See also*, *X2Y Attenuators, LLC v. Int'l Trade Comm'n*, 757 F.3d 1358, 1361 (Fed. Cir. 2014)

22

(holding that incorporated patents and continuations-in-part are 'effectively part of the host [patents] as if [they] were explicitly contained therein" and that ""the disclaimers of the incorporated patents are a part of the asserted patents.")

The Streamline asserted patents are continuations-in-part of the '324 application. The Streamline asserted patents each incorporate the '324 application by reference. The applicant arguably disclaimed the scope of its invention as applying to other resistance mechanisms besides motor-supplied resistance. At the very least, the '324 application disclaimer must inform the construction of the Streamline asserted patents. *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1460 (Fed. Cir. 1998) (Disregarding differences in claim limitations between patents in the same family when claims are "similar to each other, differing in ways immaterial to this appeal"); *See also ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003). The '324 application is consistent with iFIT's plain and ordinary understanding of the claim terms and is consistent with the understanding of one of skill in the art. Ex. iFIT-4 at iFIT APPX 000066.

Streamline is attempting to broaden the scope of its patent grant to read on resistance mechanisms that do not involve a motor providing the resistive force. Mr. Ganaja, one of skill in the art, identifies numerous resistance mechanisms that are not discussed anywhere in the specification but that are extremely well known in the art. The known spectrum of resistance mechanisms for exercise devices includes

23

magnets that provide or supply resistance, frictional brakes, wind resistance, and various strength training using weight stacks or tension rods. Ex. iFIT-4 at iFIT APPX 000066–67. That spectrum also includes an electric motor that provides the resistance, but Streamline's patent claims do not claim the entire spectrum of resistance mechanisms.

In light of the prosecution history, construing these "resistance terms" to broaden its scope to include resistance mechanisms in which the motor is not the source of the resistance would be improper.[3]

### ii.    The Streamline asserted patent's disclosure of an electric motor as the source of resistance is not an embodiment, but the invention itself.

Streamline argues that iFIT is attempting to limit the claims to a preferred embodiment. This argument is wrong. iFIT does not seek to unnaturally limit the scope of the claims, but rather seeks to limit their expansion beyond what is actually invented and claimed. If the entire specification of the patent is "solely focused" on one specific aspect that is core to the new technology, then that is different than

---

[3] In addition, this improper broadening of claims would also have the effect of likely invalidating Streamline's asserted claims at least in part because of iFIT's accused magnetic resistance technology has been used since at least as early as 2001. D.I. 8 at 34, ¶ 30. A claim should not be construed in a manner which would render that claim invalid. *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016).

ME1 39227200v.1

importing limitations from an embodiment into claims that could otherwise be read more broadly. *See Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1002–4 (Fed. Cir. 2016) (upholding the district court's construction for "communications path" as including only "wired connections" based on the reasoning that "the specification's 'repeated reference to two-wire lines and telephone lines emphasizes that the inventor was focused on this transmission medium as the core of the new technology,' and it therefore concluded that, in view of the entire specification, 'the Terry Patents are solely focused on communicating information packets long distances over wired communication paths.'"

The Federal Circuit made this finding even when: "[a]lthough the patents only describe connecting the master and slave modems over physical wires, such as a telephone line, the claims recite that the two modems are connected via a 'communications path.'" *Id.* at 1001.

Similarly, the Streamline asserted patents repeatedly reference exercise systems in which the electric motor is the source of the resistance, transferred to a user interface via cable. Streamline itself, while making general arguments that the invention might not require the motor to be the source of resistance, provides no examples from the asserted patents in which the electric motor is *not* the source of resistance or evidence that the claim language ("electric motor provides/supplies resistance") encompasses other types of common resistance mechanisms where the

25

resistance is provided differently, such as magnetic of frictional braking. Joint Brief at 12–18. If Streamline had intended its invention to cover other resistance mechanisms, it could have claimed or disclosed its invention differently.

Streamline further argues that its expanded scope is warranted by citing to the specification of the '709 patent at 12:9–12 arguing this is evidence that the electric motor and user interface are not limited in scope. But this portion of the specification is referring to the direction of movement of an exercise system such as a weight-training or a cyclinc crank (e.g. linear vs. rotational movement) not the mechanism that provides or supplies the resistive force to the user interface. '709 patent at 11:59–12:12; '186 patent at 11:63–12:15. In both the strength-training and cycle embodiments (Figs. 2, 4), the electric motor is disclosed as the source of resistance. The rest of the specification supports the conclusion that the resistive force is directly supplied by the electric motor, *i.e.* that the electric motor is the source of the resistive force via a cable. Every figure illustrating the exercise device shows and teaches that the electric motor is *the* source of resistance through a cable attached to the electric motor. *Id.* at FIGS 2, 4, 6, and 7; 5:51; 6:64–65; 7:5–7; 7:21 10:54–55; 10:63–67; 11:61–63; 12:1–3.

Each example and disclosure of the resistance in the patent's figures and written description is consistent with iFIT's construction, that the motor is the source of resistance and that the resistance is conveyed through a cable. These repeated

26

references show that the core of the invention, and in fact the only claimed resistance mechanism, is a resistance-training device using an electric motor as the source of resistance as transferred via cable.

### iii. One of Skill in the Art Recognizes That There are Various Types of Resistance Mechanisms for Providing Resistance in Exercise Devices, include Motor-supplied Resistance mechanisms

Scott Ganaja provides relevant background that is instructive for the Court to understand the relevant art, namely exercise devices with some type of resistance. There are "a variety of mechanisms or techniques that a device can use in order to provide or supply resistance to an exercise element, such as a pull cable or cycle crank." Ex. iFIT-4 at iFIT APPX 000066.

Resistance can be provided "using hydraulics or pneumatic resistance to generate resistive force to the exercise element" with "[s]mall motorized components may be used to select the desired weight or resistance level for resistance training." *Id.* at iFIT APPX 000067. As was the case with the Olsen reference discussed above. Joint Brief at 19–20. Resistance may also be provided through "fan-based resistance systems," "flexing nylon rods, elastic bands, or springs, where tension in the rods, bands, or springs," "frictional braking," or "magnetic or eddy current braking in which the resistive force is not supplied

27

through frictional contact, but via magnetic currents." Ex. iFIT-4 at iFIT APPX 000066–67.

Mr. Ganaja instructs that the state of the art also contemplates "As yet another example, exercise devices could also have an electric motor supply resistance by using electricity to generate tension/resistance to the user's exercise element via the electric motor. In these types of resistance mechanisms, the speed of the motor can provide a resistive force to a cable attached (whether through a system of pulleys, gears, or not) to the motor's spinning shaft. The shaft's speed can be adjusted up or down in response to electrical signals provided to the motor through a motor controller. The direction the motor's shaft is spinning can also be adjusted. Thus, the motor can provide resistance or assistance to a user exercise element, such as a cable, and can have that applied resistance profile dynamically adjusted based on what the controller communicates to the motor." *Id.* at iFIT APPX 000069.

Examples of motor-supplied resistance can be found in some of the prior art references (Zavadsky and Frame) considered during prosecution of the asserted patents that both applicant and examiner understood to teach motor-supplied resistance mechanisms:

ME1 39227200v.1



Fig. 1



Figure 10

signal from the calculating member **5** and to generate at least one control current for controlling the engine **11** based on the reference signal. The electrical engine **11** is driven by the control currents to generate a torque and a rotation of an engine shaft, which are transferred to the resistance element **23**. Thus the user experiences a desired resistance when influencing the resistance element **23**. The user training in the training device **21** may train fast movements since the training device does not comprise real weights. It is also possible to measure the performance of the user as a function of time.

(Frame at 7:1–10)

Resistance can be provided by various means known in the art depicted on

[0134]    FIGS. 10-12. FIG. 10 depicts a weight training machine where resistance is provided by an electrical motor/generator. **1001** is frame, **1002** is cable, **1003** is a gear box and **1004** is an electric motor. FIG. 11 depicts a weight training machine where resistance is provided by a hydraulic mechanism. **1101** is handle, **1102** is hydraulic cylinder. FIG. 11 depicts a weight training machine where resistance is provided by an electrical linear actuator. **1202** is a commercially available actuator, **1201** is an adjustable handle. Those machines can be coupled with video gaming system by an electrical circuit similar to one depicted on FIG. **7**. On the

(Zavadsky at 7:1–10)

One of skill in the art would not read the claims to encompass other resistance mechanisms, but understand the scope to be directed to motor-supplied resistance. Ex. iFIT-4 at iFIT APPX 000071.

ME1 39227200v.1

In sum, the prosecution history, entire specification taken as a whole, and prior art of record support iFIT's construction. iFIT's construction is consistent with the understanding of one of skill in the art, namely that the claimed invention is directed to a specific type of resistance mechanism.

### 3.    Plaintiff's Reply Position

The three resistance terms should be accorded their plain and ordinary meaning, i.e., the electric motor provides the resistance to the user interface, whether directly or indirectly. *See supra* § III.B.1.

iFIT does not dispute that the plain claim language does not specify any particular configuration of the motor and user interface. It does not dispute that the patents' specifications, and the references cited during prosecution, describe systems in which the motor supplies resistance indirectly, for example, using pullies or gears. And it identifies no limiting statements in the prosecution history of the asserted patents. *See generally supra* § III.B.2.[4]

iFIT nevertheless persists in injecting limitations into the claims (1) that the motor "is the source" of the resistance and (2) that the motor "directly supplies" the resistance. *See* D.I. 39 at 3-5. iFIT leaves unclear whether these are separate

---

[4] iFIT argues that the '186 patent's prosecution history shows that the motor supplies the resistive force. *See supra* § III.B.2.i. Streamline agrees. But that in no way supports iFIT's narrower "directly" construction.

30

limitations—throughout its briefing, iFIT uses "source" and "directly supplies" synonymously. *See, e.g.*, *supra* § III.B.2.ii ("[T]he resistive force is directly supplied by the electric motor, *i.e.*, . . . the electric motor is the source of the resistive force via a cable."). But, however iFIT words its construction, the parties agree—and the claims require—that the motor must provide resistance to the user interface.[5] The dispute is whether the motor must "directly" provide the resistance or whether the motor must simply provide the resistance (i.e., either directly or indirectly).

The evidence makes clear that the motor need not directly supply resistance. *See supra* § III.B.1. iFIT advances two primary arguments to the contrary: (1) that statements made during prosecution of U.S. Application No. 12/545,324 support its construction, *supra* § III.B.2.i; and (2) that the "sole[] focus[]" or "core" of the asserted claims is a motor that directly supplies resistance to the user interface, *supra* § III.B.2.ii. Neither argument has merit.

─────────────────────

[5] Of note, to "provide" requires only to "make available." *See, e.g.*, Ex. Streamline-16 at 463 (defining "provide").

### i.    The '324 application is inapposite.

The abandoned '324 application is a cousin to the asserted patents.[6] The claims of the '324 application recited an "interactive element configured to receive a force applied by a user" and an "electric drive unit comprising an electric motor." Ex. Streamline-15 at 32. They further recited that "the interactive element and electric drive unit *are physically coupled* such that the electric drive unit applies a force and/or a resistance to the at least one interactive element." *Id.* (emphasis added).

The examiner rejected these claims in view of U.S. Patent No. 6,375,598 to Frame. In response, the applicants argued that Frame did not disclose "applying a force and/or a resistance to an interactive element as recited in claim 1" because Frame relied on "mechanisms [that] are coupled to pneumatic cylinders that apply a resistance," and thus did not "disclos[e] an exercise apparatus in which *the interactive element and electric drive unit are physically coupled* such that the

---

[6] The asserted patents are identified as continuations-in-part of the '324 application, meaning they add new material to that application. *See* '709 patent at 1:15-32; '186 patent at 1:15-31; '091 patent at 1:8-26; 37 C.F.R. § 1.53(b)(2). The '324 application is only one of many prior applications on which the asserted patents build. Each is also identified as a continuation-in-part of U.S. Application No. 13/010,909, and each incorporates five additional provisional applications. *See* '709 patent at 1:15-32; '186 patent at 1:15-31; '091 patent at 1:8-26.

ME1 39227200v.1

electric drive unit applies a force and/or a resistance to the at least one interactive element." *Id.* at 7-9.

iFIT asserts that this argument limits the scope of the instant claims, *supra* § III.B.2.i, but iFIT ignores that the '324 application expressly required a direct physical connection between the "interactive element" and the "electric drive unit." *See* Ex. Streamline-15 at 32. The applicants' arguments for the '324 application rested on this claim language, which is absent from the asserted claims.[7]

Statements made during the prosecution of (tangentially) related patents regarding materially different terms are not relevant to claim construction. *See Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 944 (Fed. Cir. 2013) ("Our requirement that the patents share 'limitations in common' is not a mere technicality: it is necessary to support the inference that the patentee's earlier arguments are also applicable to the claim limitations of the patent-in-suit."); *ResQNet.com*, 346 F.3d at 1383 ("[T]he [earlier] patent's prosecution history is irrelevant to the meaning of this limitation because the two patents do not share the

---

[7] iFIT further omits that the '324 application's examiner rejected the '324 applicants' arguments. While recognizing that the claims required a physical connection, the examiner found that because "Frame discloses a system in which hydraulic or pneumatic cylinders provide the resistance, *controllably actuated via a motor* with a motor controller," Frame disclosed an exercise apparatus in which "the electric drive unit applies a force and/or a resistance to the at least one interactive element." Ex. Streamline-15 at 4 (emphasis added).

33

same claim language."); *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc*., 265 F.3d 1294, 1305-06 (Fed. Cir. 2001) (noting that accused infringer "provide[d] no plausible reason why the prosecution histories of [related patents] are relevant to the construction" where "there [were] no common claim terms in dispute," and rejecting invitation to read claim limitation expressly recited in related applications into later applications that did not contain the express limitation).

Here, the difference between the '324 application's claims and the instant claims goes to the heart of the parties' dispute. The claims of the '324 application required a direct physical connection between the "motor" (electric drive unit) and the "user interface" (interactive element). *See* Ex. Streamline-15 at 32. The claims of the asserted patents do not.[8] If anything, the express presence of a physical coupling limitation in the '324 application counsels against iFIT's proposed construction—the applicants could have, but did not, include the same language (or language requiring that the motor "directly" supply resistance) in the asserted patents. *See AIP Acquisition LLC v. Cisco Sys., Inc*., 714 F. App'x 1010, 1016 (Fed. Cir. 2017) ("We are particularly reluctant to import a limitation from the

---

[8] None of the patents require "direct" resistance, and contrary to iFIT's construction, D.I. 39 at 3-4, only the '709 patent's claims even reference a cable.

specification into the claim language here because a parent application to the . . . patent expressly claimed [that limitation].").

### ii. The intrinsic record does not require a direct connection.

iFIT's second argument similarly fails. iFIT states that the specifications "support[] the conclusion that the resistive force is directly supplied by the electric motor," and that this configuration is "core" to the technology and is "the invention itself," justifying a narrow construction of claims that "could otherwise be read more broadly." *Supra* § III.B.2.ii.

It relies on *Ruckus Wireless, Inc. v. Innovative Wireless Solutions, LLC*, 824 F.3d 999 (Fed. Cir. 2016), *supra* § III.B.2.ii, but the case is inapposite. In *Ruckus*, the Court explained, there was "no intrinsic or extrinsic evidence" to support a construction that included both wired and wireless communications. 824 F.3d at 1003. Rather, the Court noted, "the intrinsic record militates powerfully against that understanding." *Id.* The title of the patents, the description of the invention, and every embodiment contained statements emphasizing the importance of wired communications and the benefits of the claimed invention to telephone-line-based communications. *Id.*

iFIT points to no similar statements here.[9] Further, as demonstrated by Streamline's opening brief, the claims and specifications of the asserted patents provide examples of motors that directly and indirectly supply resistance. *Supra* § III.B.1; *see, e.g.*, '709 patent at 7:18-25, 12:4-12; '186 patent at 7:31-39, 12:7-15. Rather than grappling with these express disclosures, iFIT glosses over them, baldly asserting that the "specification supports the conclusion that the resistive force is directly supplied by the electric motor." *Supra* § III.B.2.ii. But neither iFIT nor its expert identifies any error in Streamline's explanation of these portions of the specifications or the related figures. *See supra* § III.B.1. And even if the patents described only one embodiment, which they do not, that "does not mean that the patent[s] clearly and unambiguously disavowed other embodiments" that a POSA

---

[9] iFIT does assert that the patents' repeated reminders that the claims are not limited to any preferred embodiment do not apply to the configuration of the motor and interface. *Supra* § III.B.2.ii. iFIT is incorrect. The patents emphasize that no embodiment is intended to limit the scope of the invention, including with respect to the configuration of elements of the invention. *See, e.g.*, '709 patent at 12:4-12 (discussing use of motor controlled wheel and emphasizing nonlimiting embodiment), 15:30-40 (noting that embodiments are "not intended to otherwise limit the scope of the present invention," and that "connection . . . and other functional aspects of the system may not be described in detail"), 15:55-60 ("[T]he components and/or elements recited in any apparatus embodiment may be assembled or otherwise operationally configured in a variety of permutations to produce substantially the same result as the present invention and are accordingly not limited to the specific configuration recited in the specific examples."); '186 patent at 12:7-15, 17:65-18:8, 18:23-28 (same).

would have recognized as within the claims' scope. *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371-72 (Fed. Cir. 2014) ("[T]his court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." (alteration in original) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004))).

### iii.    iFIT's remaining arguments are meritless.

The remainder of iFIT's arguments also fail. First, iFIT (and its expert) argues at length that the patents are limited to "a certain type of resistance mechanisms [sic]." *Supra* § III.B.2.i; *see also supra* § III.B.2.ii (asserting Streamline fails to show that the claims encompass "magnetic of [sic] frictional braking"); *supra* § III.B.2.iii (asserting that the claims are limited to certain methods of supplying resistance); Ganaja Decl. 7-12. Instead of arguing that this contention supports its proposed construction, iFIT argues noninfringement—according to iFIT, the patents are limited to "resistance mechanisms" other than the magnetic braking employed by its "silent magnetic resistance." *See supra* § III.B.2.

Whatever the ultimate construction of the resistance terms, the question of whether iFIT's accused products are within the scope of the claims is a question for the jury. *See Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011) ("It is well settled that the role of a district court in construing claims

ME1 39227200v.1

is not to redefine claim recitations or to read limitations into the claims to obviate factual questions of infringement . . . .”). But notably, magnetic braking systems, including iFIT’s, use a motor to move magnets and increase or decrease resistance. *See, e.g.*, Ex. Streamline-17, ¶ 27. Indeed, iFIT’s product literature refers to the motor that controls the magnetic braking system as the “resistance motor.” *See* D.I. 1, Ex. I at 36, 38; *see also* D.I. 1 at 22-23 (discussing same and similar related disclosures).

Second, iFIT argues, in a footnote, that if its preferred construction is not adopted, the claims would “likely” be invalid. *Supra* § III.B.2.i n. 3. Streamline contests iFIT’s invalidity arguments, but regardless, “[c]laim terms should be given their plain and ordinary meaning to one of skill in the art at the relevant time and cannot be rewritten by the courts to save their validity.” *See, e.g.*, *Hill-Rom*, 755 F.3d at 1374 (“Courts should be cautious not to allow claim construction to morph into a mini-trial on validity.”).

Third, iFIT points to its expert. *See, e.g.*, *supra* § III.B.2.i. But though iFIT’s hired consultant endorses its construction, Ganaja Decl. 12, he offers scant explanation for this conclusion, focusing instead on a generalized background

38

discussion of "types of resistance mechanisms," Ganaja Decl. 7-11.[10] Regardless, such extrinsic evidence cannot outweigh the intrinsic record. *See, e.g.*, *SkinMedica, Inc. v. Histogen Inc*., 727 F.3d 1187, 1210 (Fed. Cir. 2013) (rejecting expert opinions that "lack any substantive explanation tied to the intrinsic record; and [that] appear to conflict with the plain language of the written description"); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc*., 262 F.3d 1258, 1269 (Fed. Cir. 2001) ("[E]xtrinsic evidence . . . may not be used to vary, contradict, expand, or limit the claim language . . . .").

### 4.  Defendant's Sur-Reply Position

Streamline persists in characterizing iFIT's construction as an injection of limitations rather than the accurate definition of how one of skill in the art understands the metes and bounds of the claim language. iFIT does not dispute that the patents contemplate an embodiment in which an intermediary (e.g. a cable as seen in FIG. 2) channels the resistance provided by the electric motor. iFIT's construction indicates that the resistive force is provided via a cable. Therefore,

---

[10] As explained in Dr. Nelson's accompanying declaration, a POSA would have understood that there are many different ways to use a motor to provide resistance as claimed. Ex. Streamline-17, ¶¶ 24-28.

iFIT's use of "directly supplies" is an emphasis upon the nature of the electric motor as the source of the resistance.

### i.    Streamline misunderstands the '324 application.

Streamline states that "the '324 application expressly required a direct physical connection between the 'interactive element' and the 'electric drive unit.'" Joint Brief at 33. Not true. The 324 application required a physical coupling. Not a *direct* physical coupling. Applicant argument during prosecution required an electric motor, which was the source of resistance.

> Frame appears, therefore, to be limited to providing only a resistance through pneumatic cylinders.
> …
> Frame does not disclose or suggest **an electric motor applying a force and/or a resistance to an interactive element** as recited in claim 1.

Joint Brief at 21–22 (see also Ex. iFIT-7 at iFIT APPX 000111) (emphasis added).

iFIT recognizes that the term "physical coupling" is not found in the Streamline asserted patents. However, Streamline may not ignore a related application including prosecution history arguments that are, at the very least, informative as to how the inventor intended to limit the invention. Joint Brief at 23; *see also Laitram,* 143 F.3d at 1459–60  (Disregarding differences in claim limitations between patents in the same family when claims are "similar to each

other"). In *Laitram*, multiple terms differed between patents, including "at least two of *said* elements" rather than "at least two *transverse* elements." *Id.* at 1458. (*See also* U.S. Patent Nos. B1 4,934,518 and B1 4,886,158). The difference in the terms above was immaterial. *Id.* at 1459–60.

Here, "physical coupling" does not require a direct connection any more than "provides/supplies" requires a direct connection. Therefore, the applicant argument in the '324 application is instructive for any patent in the family. The electric motor is the source of resistance.

### ii.    The *Ruckus* patent is analogous to the Streamline patents.

Streamline is incorrect in asserting that *Ruckus* is inapposite. Joint Brief at 35. In *Ruckus*, the title of the patents, the specification, and the embodiments all supported a more narrow construction. *Id.*; *see also Ruckus*, 824 F.3d at 1003.

As in *Ruckus*, the title of the patents, the specification, and the embodiments all support a construction in which the motor is the source of resistance.

The title of each patent contains the phrase "*motor* resistance" rather than "*magnetic* resistance" or any other type of resistance. The specification, and enclosed embodiments, provide repeated and exclusive reference to motor supplied resistance. '709 patent at FIG. 2, 4, 6, 7; 6:64–65; 6:67; 7:5–7; 7:21; 10:54–55; 10:63–67; 11:61–63; 12:1–3; 5:51; '186 patent at 5:64; 7:11–12; 7:15; 7:19–21;

41

7:35; 10:57–58; 10:66–11:3; 11:65–67; 12:4–6. The prior art magnetic resistance mechanism accused of infringement in this case is nowhere disclosed.

### iii.     Streamline's expert provides no explanation for his claim that a "gear, wheel, or spool" can be a source of resistance.

Dr. Nelson agrees with Mr. Ganaja, that resistance can be provided in a number of ways. However, the real issue is the meaning of motor-supplied resistance, as claimed. Dr. Nelson appears to advocate that a "gear, wheel, or spool" may be a source of resistance. Ex. Streamline-17 at 7–8. However, Dr. Nelson provides no explanation for how these items actually supply resistance. In contrast, Mr. Ganaja explained that when, for example, a gear, is used, the gear is still dependent upon the speed of the motor. Ex. iFIT-4 at iFIT APPX 000069. In contrast, in a magnetic braking system, Mr. Ganaja explains how the magnets are the source of resistance: the resistance is dependent upon the position of the magnet, rather than the speed of the motor. *Id.* at APPX 000067, 000069.

### iv.     Streamline's patents were not examined under the patent classification code associated with magnet resistance. Rather, they were examined under the code associated with resistance by using motors.

iFIT's construction is also supported by the examination classification codes which Streamline chose for its patent applications.

42

The International classification codes for patents distinguish between providing resistance "using eddy currents induced in moved elements, e.g. by permanent magnets" (A63B 21/0051) and "using motors" (A63B 21/0058). The asserted patents are all classified under A63B 21/0058 as using motors but none of them are classified under A63B 21/0051 as using magnets to induce eddy currents. If Streamline had intended the scope of its "motor-supplied resistance" patent to actually encompass a broader scope of resistance mechanisms (such as magnet-supplied resistance," it should have given the patent office the proper intended classification for examining the art.

Had the Streamline patents been examined under A63B 21/0051, the patent office could have examined additional art in light of what Streamline now argues is the scope of its patents for litigation. Streamline cannot now apply a claim construction for infringement purposes which would have captured art that Streamline avoided during examination.

ME1 39227200v.1

### C.    Dispute 3: "via software and without a mechanical change."

| Claim Term and Claims | Streamline | iFIT |
|---|---|---|
| "altering a resistance profile provided to said cable from said electric motor . . . via software and without a mechanical change." '709 patent claim 1. | Changing the resistance through software without the user mechanically changing the resistance. | Changing the resistance supplied by the motor to the cable via software and without an additional[11] movement of mechanical parts. |

### 1.    Plaintiff's Opening Position

####     i.    The claimed methods require "changing the resistance through software without the user mechanically changing the resistance."

The plain language of claim 1 of the '709 patent clarifies a resistance profile is changed "*via* software and without a mechanical change." '709 patent at claim 1 (emphasis added). The limitation speaks to *how* the resistance profile is altered, and requires this change to occur through software, rather than mechanical intervention (such as a user turning a knob). The "controller is configured with computer readable code controlling profile resistance," i.e., *software*, to control the motor, which applies resistance to the user interface "via a cable or a linkage." '709 patent at 4:30-39; *see also id.* at 13:12-19 ("[A] microprocessor or computer and power electronics . . . are used to control the electric motor 240.").

---

[11] iFIT proposed this additional language for the first time in its sur-reply. Streamline asks to be heard on this construction at the *Markman* hearing.

The '709 patent emphasizes that this software-based approach alleviates the need for users to manually control resistance. The claimed system makes resistance adjustments automatically, for example, adjusting the resistance over time or based on the user's movements or the force he applies to the user interface, *id.* at 4:15-25, maintaining resistance "at an about constant level despite the acceleration and/or deceleration of the user interface," *id.* at 7:66-8:5, or creating "eccentric overload" so that more weight is lowered than raised, *id.* at 12:42-54.

Because software changes the resistance, the system can use sensed information to vary resistance based on the direction of movement, between repetitions in a set, or even based on the user's heartrate or blood pressure. *See id.* at 4:44-51, 6:1-28; *see also id.* at 9:43-10:6 (describing additional inputs). The patent explains that this automatic, adaptive resistance control "overcomes the limitations of the existing robotic rehabilitation, weight training, and cardiovascular training systems." *Id.* at 5:11-25. It illustrates these benefits using a bicycle as an example. In a traditional system, the resistance of the bike's pedals varies based on the position of the rider's leg, but in an embodiment of the inventive system, "[t]he computer controlled electric motor 240 allows variation of the resistance profile as a function of rotational angle 520. Unlike a . . . bicycle equipped with an elliptical crank, the resistance profile is alterable between successive revolutions of the crank via software and/or without a mechanical change." *Id.* at 11:21-34. The term should be

45

construed consistent with the invention's benefits and purpose, and with the plain meaning of the claims and the specification's disclosure. *See, e.g.*, *Clare v. Chrysler Grp. LLC*, 819 F.3d 1323, 1331 (Fed. Cir. 2016) (construing claims consistent with the specification's teachings regarding the invention's purpose).

### ii.    iFIT's proposed construction is nonsensical.

iFIT seeks to interpret the claims narrowly to require changing the resistance "without movement of mechanical parts." D.I. 39 at 6. iFIT's nonsensical proposal conflicts with the specification. In the claimed exercise system, parts move when resistance changes. For example, the patent explains that, though software controls the change in resistance, to effect that change, the motor produces torque (i.e., it spins)[12] based on software commands. *See* '709 patent at 7:25-28. And it explains that in some embodiments, the motor moves parts, such as wheels, to transfer force to the cable and the user interface. *See, e.g.*, *id.* at Fig. 4 (illustrating motor controlled wheel 462), 7:18-28 (explaining the motor "provides a resistive force *to rotation of the cable spool 242*, which transfers the resistive force to the resistance cable" (emphasis added)).

Nothing in the patent or prosecution history—or indeed, the laws of physics—suggests resistance can be changed without any mechanical change. "A claim

---

[12] Ex. Streamline-13 at 1319 (defining "torque").

construction that renders asserted claims facially nonsensical 'cannot be correct.'" *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) (quoting *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1357 (Fed. Cir. 2006)).

### 2.    Defendant's Answering Position

The language "altering a resistance profile provided to said cable from said electric motor…via software and without a mechanical change" was added during prosecution history of the '709 patent to overcome a specific prior art reference: U.S. Patent App. No. 2011/0251021 (Zavadsky) (*See* Ex. iFIT-4 at iFIT APPX 000072–75).

This phrase draws upon a disclosure found in the specification of the '709 patent at 11:8–34. Specifically, the patent specification teaches that the motor-supplied resistance profiles taught in the specification are "a result of changes in the electric motor supplied resistance" to allow variation of the resistance profile and that "[u]nlike a cam system or a bicycle equipped with an elliptical crank, the resistance profile is alterable between successive revolutions of the crank via software and/or without a mechanical change."

The disclosure seeks to distinguish between variable resistance using a mechanical change (such as a cam system) vs. variable resistance supplied by an electric motor. Ex. iFIT-4 at iFIT APPX 000073.

ME1 39227200v.1

Zavadsky taught a resistance training device "where resistance is provided by an electrical motor/generator" among other types of resistance mechanisms. Zavadsky also teaches a cam system that allows variation of the resistance profile.

[0017]  Nautilus® Nitro style equipment: During any exercise, an individuals' strength varies at different points. Other machines don't address this strength curve—instead, the weight remains constant from beginning to end. This can limit muscle recruitment and overall performance. This system is driven by a four-bar linkage system, cam design, or a combination of both, which enables matching of the body's potential increases and decreases in strength.

[0047]  Adjustable resistance—resistance that can be easily adjusted between exercise sets.
Variable resistance—resistance that can be varied within individual rep, for example to emulate Nautilus style equipment or force isokinetic exercise.

Zavadsky at ¶¶ [0017] and [0047] (Ex. iFIT-4 at iFIT APPX 000074).

Zavadsky teaches a weight machine that uses a cam to alter the resistance profile of the strength training during a repetition or between successive repetitions. A cam in this type of strength-training device allows for variable resistance, i.e., "resistance that can be varied within [an] individual rep." Ex. iFIT-4 at iFIT APPX 000074.

U.S. Patent No. 7,052,446 discusses the Nautilus Nitro style equipment identified by Zavadsky.

48



Further, the configuration of the cam unit **86** controls the resistance curve experienced by the exerciser during exer-
45  cise. Fundamentally, it is desirable to vary the resistance experienced by the exerciser at different points during movement; otherwise, the magnitude of resistance necessary to provide a strengthening workout to a muscle or muscle
50  group may be too high to enable the user to move the movement arm through positions in the full range of motion in which the user enjoys a lower mechanical advantage. In the illustrated embodiment, the non-circular surface **92** of the cam **86** causes the resistance experienced by the exer-ciser to follow the resistance curve illustrated in FIG. **10**.
55  Those skilled in this art will recognize that, although a non-circular cam is preferred to provide a varying resistance curve to the machine **10**, other structures, such as four-bar linkages and the like, can also be employed to vary the resistance of the machine during exercise.

U.S. Patent No. 7,052,446 at 6:43–59

As Ganaja identified in his report discussing the Nautilus machine referenced in the Zavadsky reference: "The variable resistance taught in Zavadsky is a result of mechanical movement of the cam within an individual rep. The patent applicant added the language "altering a resistance profile provided to said cable from said electric motor between successive repetitions of movement of said user interface via software and without a mechanical change" to overcome variable resistance within an individual rep through a mechanical change." Ex. iFIT-4 at iFIT APPX 000075.

The patentee appears to be essentially arguing that although Zavadsky teaches an electric motor providing resistance, but it does not disclose an electric motor that provides variable resistance via software. Streamline's construction adds "without

49

the user mechanically changing the resistance," but that is not what the patentee was trying to overcome in the prosecution history. iFIT's construction is proper in that it seeks to incorporate the meaning behind the narrowing amendments made by the patentee to overcome the cited prior art reference Zavadsky.

### 3.    Plaintiff's Reply Position

This limitation should be construed to mean changing the resistance through software without the user mechanically changing the resistance. *See supra* § III.C.1.

iFIT does not dispute that this limitation speaks to how the resistance profile is altered, or that the '709 patent emphasizes that its software-based approach beneficially alleviates the need for users to manually control resistance. And neither iFIT nor its expert disputes that there must be some movement of mechanical parts to change resistance. Ex. Streamline-17, ¶ 37. To the contrary, iFIT's expert appears to concede that the claimed electric motor may vary resistance by adjusting the speed of a spinning shaft. *See* Ganaja Decl. 10; *see also supra* III.B.2.iii. But iFIT nevertheless argues that its construction is compelled by the prosecution history of the '709 patent. *Supra* § III.C.2. iFIT misreads the record.

The predicate of iFIT's argument is that the language "altering a resistance profile provided to said cable from said electric motor . . . via software and without a mechanical change" was "added during prosecution history [sic] of the '709 patent

50

to overcome a specific prior art reference." *Id.* Thus, according to iFIT, the claim language must be read such that it distinguishes the "specific prior art reference." *Id.*

But the cited language was not added to overcome a rejection. Claim 1 of the '709 patent was originally presented in dependent form as claim 18 of the as-filed application. *See* 35 U.S.C. § 112(c) (explaining that "[a] claim may be written in independent or, if the nature of the case admits, in dependent or multiple dependent form"); Ex. Streamline-18 at 25-26. In the first office action, the examiner rejected other claims of the application over the prior art, but he specifically found that "[c]laims 18, 19, [and] 21 . . . would be allowable if rewritten in independent form." *Id.* at 20. In response, the applicant reformatted claim 18 "for the purpose of expediting the patent process," and the examiner allowed the claim. *Id.* at 10.

In doing so, the applicant did not craft a new limitation to overcome any rejection—originally presented claim 18 had already been found allowable and was merely reformatted. Nor did the examiner elaborate on why claim 18 was allowable. He did not state that claim 18 was allowable because it expressly distinguished a "cam system" on the basis that a cam system relies on mechanical movements, as iFIT argues. *Supra* § III.C.2.

Instead, the examiner emphasized that claim 18 was allowable as a whole, requiring the claims to recite (1) altering a resistance profile provided to said cable from said electric motor, (2) between successive repetitions of movement of said

51

user interface, (3) via software, and (4) without a mechanical change. Ex. Streamline-18 at 6, 20. Notably, Mr. Ganaja acknowledges that the cited prior art "does not disclose an electric motor that provides variable resistance via software," Ganaja Decl. 16, suggesting that claim 18 was allowable at least because it required varying resistance "via software," not because the examiner understood the claims to (nonsensically) require changing resistance without any movement of mechanical parts. The law imposes no requirement that *every* aspect of a claim be different from the prior art for allowability. *See generally* 35 U.S.C. §§ 102, 103.

### 4.    Defendant's Sur-Reply Position

iFIT's proposed construction does not seek to argue that any movement of a motor shaft or motor linkage used for the motor to supply resistance to the cable is outside the scope of the claim. What iFIT intends is for the claim construction to reflect the teachings of the intrinsic evidence: that there is no *additional* mechanical change or mechanical movement needed to alter the resistance "provided to said cable from said electric motor."

The specification teaches that the electric motor itself changes its speed via software changes so that it can dynamically alter the resistance that it provides to the cable. It does not rely on other mechanical changes or movement of other mechanical parts for dynamic adjustment of a resistance profile. The emphasis of the alleged invention is on the ability of the motor itself to dynamically alter resistance and that

there does not need to be additional mechanical structure (such as a magnet) for adjusting the resistance. If the Court finds it necessary, it could add clarifying language to iFIT's proposed construction (suggested in red above). The purpose of iFIT's construction is to align the meaning of the language with what the intrinsic evidence teaches about how the motor makes adjustments to the resistance that it supplies.

As mentioned above, the intrinsic evidence has two areas that provide insight into how to understand the meaning of  "altering a Resistance profile provided to said cable from said electric motor…via software and without a mechanical change," and both are supportive of each other and iFIT's understanding.

The specification uses the term at issue[13] to make the point that the motor-supplied resistance is dynamically alterable between successive revolutions of the crank via software and distinguishing it from "a cam system or a bicycle equipped with an elliptical crank." '709 patent 11:8–34. Neither of those systems require a user to mechanically or manually alter the resistance themselves. Rather, the alterations in the resistance profile are made via a separate or additional mechanical structure. The patent seeks to distinguish itself by highlighting that it relies on

---

[13] The language of this term was added to the scope of independent claim 1 in order for the claim to overcome Zavadsky (which teaches a cam system for altering resistance, as shown above).

"changes in the electric motor supplied resistance" (*Id.*) to allow for variable resistance, rather than a separate mechanical change.

For example, on a strength training device with a cam system like that taught in Zavadsky, the movement of the cam alters the resistance experienced by the user at different points in the repetition due to its particular shape. The variable resistance is provided not by the motor, but movement of a separate mechanical part. This is what the patent teaches away from when stressing that the resistance is altered based on "changes in the electric motor supplied resistance" via software.

### D.    Dispute 4: "means for communication . . ."

| Claim Term and Claims | Streamline | iFIT |
|---|---|---|
| "means for communication between said exercise system and the external video game system"<br><br>'709 patent claims 1, 12. | Function: communication between said exercise system and the external video game system.<br>Structure: communication element 740, e.g., a wired and/or wireless digital link 726 between the exercise system 100 and game system 700 carrying analog and/or digital information, a signal transmitted from the gaming system wirelessly 742 using any part of the electromagnetic spectrum, an optical signal, and a signal transmitted from the exercise system wirelessly 744 using any part of the electromagnetic spectrum. | Function: Agreed.<br>Structure: wired and/or wireless digital link 726 between the exercise system 100 and game system 700 carrying analog and/or digital information, a signal transmitted from the gaming system wirelessly 742 using any part of the electromagnetic spectrum, an optical signal, or a signal transmitted from the exercise system wirelessly 744 using any part of the electromagnetic spectrum. |

ME1 39227200v.1

| Claim Term and Claims | Streamline | iFIT |
|---|---|---|
| "means for communication with the secondary user"<br><br>'186 & '091 patents claims 1, 11. | <u>Function</u>: communication with the secondary user.<br><u>Structure</u>: communication element 740, e.g., a wired and/or wireless digital link 726 between the exercise system 100 and game system 700 carrying analog and/or digital information, a signal transmitted from the gaming system wirelessly 742 using any part of the electromagnetic spectrum, an optical signal, and a signal transmitted from the exercise system wirelessly 744 using any part of the electromagnetic spectrum. | <u>Function</u>: Agreed.<br><u>Structure</u>: cloud 812, the internet 814, or over a local area network 816. |

### 1.    Plaintiff's Opening Position

#### i.    "Communication element 740" is the corresponding structure for the "means for communication."

The claims recite that the exercise system includes "means for communication." '709 patent at claim 1; '186 patent at claim 1; '091 patent at claim 1. The parties agree that this limitation is a means-plus-function limitation and that the function is recited by the claims—"communication between said exercise system and the external video game system," for the '709 patent, and "communication with the secondary user," for the '186 and '091 patents. D.I. 39 at 7-8.

The corresponding structure is communication element 740. As the patents explain, the described "exercise system 100" includes "communication element 740." *See* '709 patent at Fig. 7; '186 patent at Fig. 7. The patents teach that "communication element 740 includes any element used to convey any form of information from the exercise system 100 to the gaming system 700 or vi[c]e-versa." '709 patent at 14:4-6; '186 patent at 14:20-22 (same). They provide specific "[e]xamples of a communication element 740," including "a wired and/or wireless digital link 726 between the exercise system 100 and game system 700 carrying analog and/or digital information," "a signal transmitted from the gaming system wirelessly 742 using any part of the electromagnetic spectrum," "an optical signal," and "a signal transmitted from the exercise system wirelessly 744 using any part of the electromagnetic spectrum." '709 patent at 14:6-14; '186 patent at 14:22-29 (same).

The patents reiterate elsewhere that the communication may be made "online, over a local area network, over the internet and/or . . . [via] the cloud." '709 patent at 15:2-4; '186 patent at 15:22-35 (noting information can be shared "using the cloud 812, the internet 814, or over a local area network 816"); *see also* '186 patent at 17:8-11 (noting applicability of exemplary gaming and delivery systems to one another). But the only structure disclosed to accomplish these communications is communication element 740. *See, e.g.*, *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d

1340, 1361 (Fed. Cir. 1998) ("[I]t is incorrect to construe claims contrary to the specification, and it is incorrect to construe terms in means-plus-function form as disembodied from the structure in the specification.").

### ii.    iFIT ignores the disclosed structure.

iFIT nevertheless proposes two different corresponding structures, one for the '709 patent and one for the '186 and '091 patents. D.I. 39 at 7-8. iFIT errs in proposing different constructions for "means for communication"—the same term in related patents should be construed consistently. *See Trs. of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016) (noting that for terms within the same patent family, "we must interpret the claims consistently across all asserted patents" (quoting *NTP, Inc. v. Rsch. in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005)); *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1030 (Fed. Cir. 2002) ("[T]he same term or phrase should be interpreted consistently where it appears in claims of common ancestry."). And the "means for communication" is the same in all three patents, even if the endpoints of communication change.

Further, both of iFIT's proposed structures are wrong. For the '709 patent, iFIT agrees with the bulk of Streamline's construction. It concedes that the corresponding structure may include a wired or wireless link or a transmitted signal. *See* D.I. 39 at 7. But iFIT omits the actual structure within the claimed exercise

system, communication element 740, of which these links and transmissions are "[e]xamples." '709 patent at 14:6-14; '186 patent at 14:22-29 (same).

And for the '186 and '091 patents, iFIT seeks to narrow the structure to the "cloud 812, the internet 814, or over a local area network 816." D.I. 39 at 8. iFIT necessarily argues that the exercise system uses a different structure when communicating with the external video game system (as in the '709 patent) than when communicating with the secondary user (as in the '186 and '091 patents). But the specifications of the '186 and '091 patents do not support this position. As noted, the sole structure within the claimed exercise system for communicating is communication element 740. *See supra* § III.D.1.i; *see also* '186 patent at Fig. 8 (illustrating cloud, internet, and local area network separately from exercise system). Communication element 740 may *use* the internet, a local area network, or the cloud to transfer information, *see* '709 patent at 15:2-4; '186 patent at 15:22-35, but the corresponding structure remains communication element 740, and these terms should be construed accordingly.

### 2.    Defendant's Answering Position

#### i.    "[M]eans for communication [between said exercise system and the external video game system"]

Here, the parties are in agreement with the exception of whether "communication element" is corresponding structure to the means for

communication between said exercise system and the external video game system. iFIT contends it should not be considered part of the corresponding structure.

"Even if the specification discloses corresponding structure, the disclosure must be of 'adequate' corresponding structure to achieve the claimed function." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1352 (Fed. Cir. 2015). While the specific examples of "communication element" are adequate structure, the generic term "communication element" is not. *See Saffran v. Johnson & Johnson,* 712 F.3d 549, 561 (Fed. Cir. 2013) (corresponding structure limited to hydrolyzable bonds– "the only type of bond identified" in the patent for performing the function, not more generic "chemical bonds and linkages.")[14]

Here, "communication element," is a generic element like the "chemical bonds and linkages" which were not considered structure in *Saffran*. The elements cited by iFIT, such as "an optical signal" is like the specific "hydrolysable bonds" which were considered corresponding structure in *Saffran*. Therefore, iFIT's

---

[14] *See also Furnace Brook LLC v. Overstock.com, Inc.,* 230 F. App'x 984, 988 (Fed. Cir. 2007) ("The label 'online interactive communications network,' however, identifies no specific structure for performing the claimed function; it describes only a generic class of structures and was thus properly ignored.") citing *Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543, 1551-52 (Fed.Cir.1997) (holding that the disclosed wave forms for performing a claimed function included a wave form specifically identified in the specification but did not include the nonspecific set of "other wave forms" mentioned only generically in the specification as suitable for performing the claimed function);

59

corresponding structure is correct and "communication element" should not be included as corresponding structure for this term.

The parties are in agreement regarding the actual physical structure that is disclosed. Maintaining generic and uncertain functional language of "communication element" as corresponding structure could provide Streamline with an opportunity to expand the scope of the claim beyond the physical structure disclosed for this "means plus function" term.

### ii.    [M]eans for communication [with the secondary user]

The dispute here involves whether the two different "means for communication" disclosed in the asserted patents can be interchangeable. Streamline's position asserts that the two different "means for communication" terms being discussed here have the same corresponding structure. They do not. The separate terms are shown below:

- "means for communication between said exercise system and the external video game system."

- "means for communication with the secondary user"

As part of the Joint Claim Construction Chart and even in Streamline's own brief, the terms are considered separate and refer to different functions. D.I. 39 at 7–8; Joint Brief at 54–55.

60

"A structure disclosed in the specification qualifies as a 'corresponding structure' if the specification or the prosecution history '***clearly links or associates that structure to the function recited in the claim***.'" *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012) (emphasis added). The portion of the '186 patent specification relating to communication with a secondary user discloses ('186 patent at 15:21–17:42) the corresponding structure identified by iFIT. *Id.* at 15:25–27. The '186 patent "clearly links" the structure identified by iFIT to the claimed function of "communicating with a secondary user."

The '186 patent does not, however, clearly link the structure identified by Streamline to the function of communicating with secondary users. The portion of the specification Streamline considers the corresponding structure is tied to the function communicating between an exercise system and video game system and does not mention communicating with a secondary user. *Id.* at 14:19–41. In addition, the figure (shown below) referenced in the portion of the '186 and '091 patents referring to communicating with a secondary user shows the three types of corresponding structure for communicating with a secondary user. The cloud 812, internet 814, and Local Area Network 816. *Id.* at Fig. 8.

ME1 39227200v.1



Figure 8.

None of the corresponding structure cited by Streamline is found in the figure above in the context of communicating with a secondary user. The structure cited by Streamline is not "clearly connected" to the claimed function of communicating with a secondary user.

Finally, Streamline cites to '709 patent at 15:2–4 and '186 patent at 15:22–35 to argue that communication element 740 could include the cloud, internet, and/or Local Area Network. Joint brief at 58. If Streamline considers the corresponding structure identified by iFIT (and clearly identified in Figure 8) to be part of its corresponding structure, it should so state, rather than relying on a generic functional term "communication element." As with the other "means for communication" term,

relying on a generic reference to a "communication element" is not a proper substitute for identifying the actual corresponding physical structure. The corresponding structure cited by iFIT is the correct corresponding structure.

### 3.    Plaintiff's Reply Position

The correct structure for both "means for communication" terms is communication element 740. *See supra* § III.D.1.i.

iFIT contests this construction for each asserted patent. For the '709 patent, its sole argument is that "communication element" is too generic to serve as corresponding structure. *Supra* § III.D.2.i. iFIT relies on cases in which the patentee sought to expand the scope of the corresponding structure beyond the structure disclosed in the patent. *See, e.g.*, *Saffran*, 712 F.3d at 563 . But here, the parties agree that the claimed communication occurs through a "wired and/or wireless digital link," or through a signal. *See* D.I. 39 at 7-8. The dispute is whether the means for communication—which is part of the claimed exercise system, *see* '709 patent at claim 1; '186 patent at claim 1; '091 patent at claim 1—includes the actual structure within the exercise system, communication element 740, of which these links and transmissions are "[e]xamples." '709 patent at 14:6-14; '186 patent at 14:22-29 (same). The record makes clear that it must. *See supra* § III.D.1.i.

As to the '186 and '091 patents, iFIT correctly identifies the parties' dispute as whether the "means for communication" between the exercise system and the

video game system and the exercise system and the secondary user "can be interchangeable." *Supra* § III.D.2.ii. The patents specifically resolve this question. They teach that the secondary user may *be* a video game competitor. *See, e.g.*, '186 patent at 3:64-4:12, 13:65-14:18, 15:36-41, 16:23-38. And they expressly teach that "any of the computer information delivery system 800 elements or remote access elements, described supra, are optionally implement[ed] with any of the gaming system 700 elements and vi[c]e-versa," *id*. at 17:8-11, that is, the elements described in the secondary user embodiments apply equally to the gaming system embodiments, and the elements described in the gaming system embodiments apply equally to the secondary user embodiments. In view of these express disclosures, iFIT's attempt to limit the corresponding structure to only a subset of the disclosed structure is incorrect. While a communication element that uses the internet, a local area network, or the cloud is within the scope of the "means for communication" (for all three patents), it is not the whole scope.

### 4.    Defendant's Sur-Reply Position

Streamline continues to broaden the corresponding structure associated with the means for communication in the asserted patents. But Streamline has yet to rebut iFIT's assertion that "communication element 740" is simply a generic term and, according to Federal Circuit law, cannot be corresponding structure. Joint Brief at 59; *see Saffran,* 712 F.3d at 561 (corresponding structure limited to hydrolysable

64

bonds-"the only type of bond identified" in the patent for performing the function, not more generic "chemical bonds and linkages").

Streamline asserts that "iFIT relies on cases in which the patentee sought to expand the scope of the corresponding structure beyond the structure disclosed in the patent." Joint Brief at 63. iFIT relies on *Saffran* which was certainly a case in which the generic term, "chemical bonds," was disclosed in the patent. *Saffran*, 712 F.3d at 562–63 ("we are not persuaded that the specification's scattered use of the generic phrase 'chemical bonds' conveys additional, specific corresponding structures separate and apart from hydrolyzable bonds.")

With regards to the means for communication with a secondary user, again, Streamline does not show that the patent specification clearly connects, as required by *Noah*, the alleged corresponding structure to the function. *Noah*, 675 F.3d at 1311 (Corresponding structure, only "if the specification or the prosecution history 'clearly links or associates that structure to the function recited in the claim'"). Streamline attempts to connect secondary users to the corresponding structure associated with the means of communication of a video game system. Joint Brief at 63–64. Streamline's attempts are anything but clear to a person of ordinary skill viewing the patent. What is clear, is Figure 8, shown below:



**FIG. 8**

None of the corresponding structure suggested by Streamline is shown in the figure above. The corresponding structure suggested by iFIT is.

ME1 39227200v.1

### E.    Dispute 5: "external video game system"

| Claim Term and Claims | Streamline | iFIT |
|---|---|---|
| "external video game system" '709 patent claims 1, 12. | Video game system including at least one component that is not physically contained in the exercise system. | A non-embedded external game system. |

#### 1.    Plaintiff's Opening Position

##### i.    The external video game system has at least one external component.

The '709 patent claims an "external video game system." '709 patent at claim 1. The specification shows that this "external" system includes at least one component that is not physically contained in the exercise system.

The patent explains that the exercise system may be used with a gaming system, and it teaches that the gaming system "optionally includes" a game console, a display device, and a user controller, among other things. *See id.* at 13:29-45; *see also id.* at 13:36-37 ("This example . . . is not limiting in scope."). It further explains that the game console "is optionally embedded with and/or in the exercise system 100." *Id.* at 13:51-53; *see also id.* at 13:53-54 ("Examples of game consoles 710 include: a computer in the exercise system 100 . . . ."). Similarly, the display device may be external to the exercise system or may be "display screen 494," which the patent elsewhere describes as "directly and[/]or indirectly attached to" the support base of exercise system 100. *Id.* at 10:58-60, 13:42. But the user controller is part of the exercise system. The patent explains that the controller "senses actions of the

67

user 110" and that the "user controller directly and/or indirectly sends collected data and/or information to the gaming system 700." *Id.* at 14:46-50. And it further explains that this data stems from "actual physical interaction with a resistance device." *Id.* at Abstract; *see also id.* at Fig. 7 (displaying user interacting with weightlifting bar 220).

Thus, while the specification contemplates some aspects of the gaming system may be external to the exercise system, it contemplates that others are incorporated into the exercise system. And the prosecution history does not alter this understanding. Accordingly, "external video game system" should be construed as a "video game system including at least one component that is not physically contained in the exercise system."

### ii.    iFIT's proposed construction is unsupported by the specification.

iFIT contends that the entire "external video game system" is "non-embedded," D.I. 39 at 9, but as discussed, the specification discloses that components of the game system may be embedded in the exercise system. *See supra* § III.E.1.i. iFIT's contention that the entire "external video game system" is "non-embedded" is thus plainly incorrect; "claims must be construed so as to be consistent with the specification, of which they are a part." *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003).

68

### 2.    Defendant's Answering Position

The parties' dispute over this term relates to how to interpret the term "external" in light of the teachings of the specification. The specification defines a video game as "any electronic game that involves human interaction with a user interface to generate visual feedback on a video device." ''709 at 14:52–54. It further teaches a gaming system that includes "a game console 710; a display device 720, such as a display screen 494; a communication element 730; a sensing element 740; and/or a user controller. '709 patent at 13:39–45.

The figure depicting the elements of the video game system is shown below.



'709 patent at Fig. 7.

Streamline argues that the specification allows for certain elements of the video game system to be "embedded," "directly . . . attached," and/or "directly . . . sends collected data." Joint Brief at 67–68. However, this just reflects an *unclaimed*

69

embodiment. The specification excerpt below identifies that a video game console could "optionally be embedded with and/or in the exercise system" or it could be an external video game console:

> Game Console
>
> A game console **710** is an interactive entertainment computer or customized computer system that produces a video display signal that is optionally used with a display device, described infra. Herein, a game console includes a video game system and/or a computer system. The game console **710** is optionally embedded with and/or in the exercise system **100**. Examples of game consoles **710** include: a computer in the exercise system **100** or any form of proprietary or commercially available gaming system, such as those produced by Nintendo® (Kobe, Japan), Sony® (Tokyo, Japan), Microsoft® (Redmond, Wash.), or the like. Particular examples of video game consoles include the Wii® (Nintendo, Kobe, Japan), PlayStation® (Sony, Tokyo, Japan), Xbox®, (Microsoft, Redmond, Wash.), or the like.
>
> Display Device
>
> A display device **720** outputs a video display signal, such as from an external game console **710** or from an internal computer of the exercise system **100**. Examples of a display device **720** include: a television, a monitor, an optically emitting diode display, or a personal display device, such as a smart phone or tablet. The display device **720** is optionally

'709 patent at 13:47–67.

An external video game system could be one of among the "commercially available gaming systems" or "game consoles" identified in the specification.

Further, the claim language is for the "external *video game system*" and not for an "external display device," "external user controller," or "external game console." All aspects of the video game system are external and none are embedded in the exercise system 100 because the claim language is for the entire video game system, not just certain elements.

70

The specification further supports that the video game system is not embedded within the exercise system 100. "The invention comprises a computer assisted exercise equipment method and apparatus configurable for **_linkage_** to a game console and/or as an input device to a video game." '709 patent at 3:34–36. The term "linkage" is consistent with figure 7 in which the video game system is linked to the exercise system via a "wired and/or wireless digital link 726 between the exercise system 100 and the game system 700." '709 patent at 14:7–9 (element 726 in the specification corresponds to element 746 in figure 7). Indeed, the claim language requires this "means for communication" linkage as an element to communicate between the exercise system and the _external_ video game system. Claim 1 tracks along with Figure 7 in which the exercise system 100 is linked to an _external_ video game system via a "means for communication."

iFIT's construction is consistent with the specification and understanding that the specification contemplates an external video game system that requires a "means for communication" to link it with the exercise system. If Streamline wanted to read its claim on internal or embedded embodiments, it should not have used the term "external" when claiming its invention.

### 3.    Plaintiff's Reply Position

For the reasons explained previously, *see supra* § III.E.1, "external video game system" should be construed to mean a video game system including at least one component that is not physically contained in the exercise system.

iFIT, however, asserts that as properly construed, each "optionally include[d]" "aspect[] of the video game system"—the game console, display device, communication element, sensing element, and user controller—must be external to the exercise system. *Supra* § III.E.1; *see* '709 patent at 13:39-45. iFIT is wrong.

As Streamline explained, and as iFIT does not contest, the '709 patent's specification teaches varying distributions of specific components between the exercise system and the external video game system. *See supra* § III.E.1.i. The claimed video game system "optionally includes" a number of components. '709 patent at 13:29-45. But neither the plain claim language nor the specification mandates which of these components must be external to the exercise system, much less that *all* of them must be. While iFIT makes much of the specification's use of the term "linkage," the '709 patent states only that the exercise system may be "configur[ed] for linkage to a game console," a component of the video game system. *See id.* at 3:34-36, 13:29-45; *supra* § III.E.2. Nothing requires the entire video game system to be external.

72

iFIT asks the Court to rule that each embodiment in which every possible component of the video game system is not external to the exercise system is unclaimed. *Supra* § III.E.2. But iFIT does not dispute that the specification teaches that components of the video game system may be either internal or external to the exercise system.[15] And it does not contest that the '709 patent uniformly describes the user controller as part of the exercise system—after all, the user controller must "sense[] actions of the user 110" as he or she interacts with the resistance device of the exercise machine. *See* '709 patent at Abstract, 14:46-50, Fig. 7.

Nor does iFIT identify any disclosed embodiment in which every optional component of the video game system (the game console, display device, communication element, sensing element, and user controller, *see id.* at 13:29-45) is external to the exercise system. Even Figure 7, to which iFIT refers, *see supra* § III.E.2, illustrates the communication element as distributed between the exercise system and the video game system, and does not specify the location of the user controller. *See* '709 patent at Fig. 7. And the description accompanying Figure 7 shows that the elements of the video game system can be embedded with the exercise system, emphasizing that Figure 7 "is used for clarity of presentation and is not

---

[15] Indeed, as seen in a two-paragraph screenshot of the '709 patent that iFIT does not elaborate on, *supra* § III.E.2 (citing '709 patent at 13:47-67), the specification expressly states that "[e]xamples of game consoles 710 include: a computer *in the exercise system 100.*" '709 patent at 13:53-54 (emphasis added).

limiting in scope." *Id.* at 13:34-37; *see also, e.g.*, *id.* at 13:51-53 ("The game console 710 is optionally embedded with and/or in the exercise system 100."), 13:62-64 ("A display device 720 outputs a video display signal, such as from an external game console 710 or from an internal computer of the exercise system 100."), 14:4-6 ("A communication element 740 includes any element used to convey any form of information from the exercise system 100 to the gaming system 700 or vi[c]e-versa."), 14:45-48 (describing the user controller as receiving input from the user and the controller of the exercise system).

Consistent with these disclosures, nothing in the claims excludes embedding one or more components of the video game system in the exercise system—rather, the claims only require a way to communicate between the exercise system and one or more external components of the video game system. *See id.* at claim 1. iFIT's construction is accordingly incorrect; claims are not normally interpreted "in a way that excludes embodiments disclosed in the specification," much less in a way that excludes all embodiments disclosed in the specification. *See, e.g.*, *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008).

### 4. Defendant's Sur-Reply Position

Streamline defies the plain claim language to support its construction, which somehow asserts that an *external* system can be, for the most part, internal. The claim language calls for an "*external* video game *system*." Not an external video

game controller, or any other number of elements which help make up the system (which is the claimed element). '709 patent at 13:39–45. In fact, Figure 7, shown below, shows that **every** component of a video game system found in the '709 patent at 13:39–45 may be external to the exercise system.



**FIG. 7**

Contrary to Streamline's assertion (Joint Brief at 73), communication element is clearly external as it is labeled 730, far from the exercise system, 100. The user controller is not labeled with a specific number but there is no indication in the patent that the user controller may be internal to the exercise system. In fact, the

ME1 39227200v.1

specification suggests that the user controller is in direct contact with the user, rather than internal to the exercise system 100. '709 patent at 14:45–50 ("user controller senses actions of the user 110").

iFIT does not contest that the specification teaches that the components of the video game system could be internal or external. Joint Brief at 73. However, if that is Streamline's argument, then Streamline misses the point. One of the embodiments taught in the specification, an internal video game system, is not claimed, as evidenced by the language of the claim: ***external*** video game system.

### F.    Dispute 6: The "iso-inertial" Terms

| Claim Term and Claims | Streamline | iFIT |
|---|---|---|
| "iso-inertial resistance" '709 patent claim 12. | Resistance force applied to the user interface that is maintained at an about constant level. | Resistance force applied to the user interface that is maintained at about a constant level of force through the full range of motion or rep. |
| "iso-inertial force" '091 patent claim 1. | Resistance force applied to the user interface that is maintained at an about constant level. | Resistance force applied to the user interface that is maintained at about a constant level of force through the full range of motion or rep. |

### 1.    Plaintiff's Opening Position

Discussing iso-inertial operation, the patents state that "the physical resistance supplied by the electric motor is maintained at an iso-inertial resistance," elaborating

that at an "iso-inertial resistance," "the force is maintained at an about constant level despite the acceleration and/or deceleration of the user interface." '709 patent at 7:66-8:5; '091 patent at 8:13-19 (same). The claims should be construed in accordance with this statement.

iFIT seeks to import an additional limitation—that the resistance is maintained "through the full range of motion or rep." D.I. 39 at 10. But the intrinsic record contains no requirement that force be maintained for any particular duration. *See Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1363-64 (Fed. Cir. 2019) (rejecting construction "much narrower than the plain meaning of the claim limitation and . . . unsupported by either the specification or the prosecution history"). iFIT's proposal should be rejected, and these terms should be construed to mean "resistance force applied to the user interface that is maintained at an about constant level."

### 2. Defendant's Answering Position

#### i. The specification includes a definition of iso-inertial which supports iFIT's construction of the term.

The specification shows that iFIT's construction, including the detail regarding a full range of motion or rep, is correct. "In one example, the physical resistance supplied by the electric motor is ***maintained at an iso-inertial resistance*** through the solving of the equation F=ma, ***such that the force is maintained at an***

*about constant level* despite the acceleration and/or deceleration of the user interface, *where about constant is less than 1, 5, 10, or 20 percent of a maximum load within a repetition*." '709 patent at 7:66–8:5; '091 patent at 8:13–19. Streamline cited to this same portion of the specification. Joint brief at 76–77. However, Streamline neglected to emphasize the portion where "about constant" is further defined as: "less than 1, 5, 10, or 20 percent of a maximum load *within a repetition*." 709 patent at 8:3–5; '091 patent at 8:18–19.

Therefore, iFIT is not importing an additional limitation, unsupported by the specification or prosecution history, as Streamline suggests. Joint brief at 77. Both parties cite to the same section of the specification, but Streamline's definition falls short of providing the full definition provided by the patentee. The drafter of the asserted patents included a definition of the term "iso-inertial." Within that definition is language requiring that the term be viewed within the context of a repetition. The drafter is permitted to create their own definition. *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed. Cir. 1998) (The written description is considered, in particular to determine if the patentee acted as his own lexicographer, as our law permits, and ascribed a certain meaning to those claim terms.) iFIT is respecting the definition of iso-inertial which the drafter of the patent afforded that term.

ME1 39227200v.1

### ii. The prosecution history illustrates the importance of including "within a rep" as part of the term's claim construction.

The specification of U.S. Patent Application No. 12/545,324 ("'324 application") provides a scenario that teaches iso-inertial is a meaningless term without the context of a repetition to support it.

> "The system shown in Figs. 1-4 may be designed to reproduce weight training exercises with free weights in normal gravity under microgravity conditions. ***During the raising or concentric portion of the free-weight squat exercise on earth, accelerating a mass from rest results in a fluctuation in ground reaction force. It is characterized by an initial period of force greater than the load while accelerating from rest followed by a period of force lower than the external load during negative acceleration. During the deceleration phase, less force is exerted and the muscles are loaded sub-optimally.*** Additionally, the biomechanics of the squat exercise dictate an ascending strength curve meaning that the muscles can produce progressively more force as the barbell is raised though the range of motion. The sub-optimal loading from inertia during deceleration is compounding by receiving less loading at the point that is biomechanically the strongest near the end of the range of motion. ***Computer controlled resistance is used to simulate the initially high forces associated with the inertial effects of accelerating a mass from rest as well as controlling the force in real time to maximize the force exerted during the deceleration phase of the concentric exertion***."

Ex. iFIT-8 at iFIT APPX 000119 ('324 Application Prosecution History).

The '324 application specification describes a problem. A user must exert more force while accelerating a weight at the beginning of a repetition. Towards the end of the repetition, a user is at their strongest (based on the position of their body) but need not exert nearly as much force because the weights are no longer accelerating (in fact, the weights are decelerating). So, the problem, in terms of muscle building, is that the user's muscles are under-utilized at the end of a repetition and will therefore result in less strength gain from the exercise. To overcome this problem, the computer increases the resistance at the end of a repetition to force the muscles to continue to work hard even when the weights are decelerating instead of accelerating.

The aforementioned scenario is the situation in which iso-inertial force makes sense. That is why the drafter of the patent included "within a repetition" in the definition of iso-inertial.

### 3.    Plaintiff's Reply Position

"Iso-inertial [resistance/force]" should be construed, consistent with the specification, to mean resistance force applied to the user interface that is maintained at about a constant level. *See supra* § III.F.1.

iFIT concedes that the patents describe "iso-inertial" as "at an about constant level," *Supra* § III.F.2.i (emphasis omitted), but it asks the Court to import an

80

additional limitation—that the iso-inertial resistance is maintained "through the full range of motion or rep." D.I. 39 at 10.

iFIT makes two arguments in support of its proposed construction, but neither is correct. First, iFIT argues that Streamline defined "iso-inertial" when it stated that "about constant is less than 1, 5, 10, or 20 percent of a maximum load within a repetition." *Supra* § III.F.2.i (emphasis omitted) (quoting '709 patent at 7:66-8:5; '091 patent at 8:13-19). In providing examples of an "about constant" *level*—e.g., maintaining force at 20% of the repetition's maximum—the patentee did not impose a *durational* requirement, as iFIT argues, much less a requirement that the force be maintained through a full repetition. The claim language makes this clear—iso-inertial force may be maintained "within one-half of a repetition," '091 patent at claim 1, or may be varied "based on acceleration of [the] user interface element," '709 patent at claim 12.

Second, iFIT argues that because a different patent with a different specification describes benefits to varying resistance over the course of a repetition, the term "iso-inertial," which does not appear in the cited excerpt (or anywhere in the specification of the '324 application, *see generally* Ex. Streamline-15 at 36-45), should be interpreted to require a constant force through a repetition. *Supra* § III.F.2.ii. iFIT offers no support for the novel proposition that the specification of a different patent containing no discussion of the disputed term should inform claim

81

construction. And though it submits that maintaining iso-inertial force throughout a repetition "makes sense," "[a]ttorney argument is not evidence." *See, e.g., Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017).

### 4.    Defendant's Sur-Reply Position

Streamline's construction is intended to remove a requirement that binds the term to a specific duration. However, Streamline must ignore (and does ignore) the asserted patents' specifications to do so. The specification clearly imposes a durational limitation. '709 patent at 7:66–8:5 ("iso-inertial resistance . . . force is maintained at an about constant level . . . ***within a repetition***"). By using the term "maintain" in its proposed construction, Streamline recognizes a durational limitation. iFIT's proposed construction assists the trier of fact by defining the implied duration based on the teaching from the specification.

Contrary to Streamline's argument, the claim does not remove the duration requirement mentioned in the specification; in fact, the claim language specifically references the duration inherent in the definition (i.e., calculation) of iso-inertial. *See*, *e.g.*,'091 patent at claim 1 ("wherein said controller dynamically maintains the resistive force . . . of an iso-inertial force ***as a function of time within one-half of a repetition***").

Description of iso-inertial in the '324 application (Joint Brief at 79) is applicable to the asserted patents because the '324 application and asserted patents

address a similar problem, providing resistance in low gravity situations. Ex. iFIT-10 at iFIT APPX 000131, 000134; Ex. iFit-8 at iFIT APPX 000119; '709 patent at 15:8–16; '186 patent at 5:1–10, 17:43–51. The use of slightly different language in the asserted patents is immaterial in utilizing the '324 application to understand the applicant's meaning of iso-inertial force or resistance. The definition in the '324 application for "iso-inertial" is consistent with dictionary definitions of "iso" and "inertial."

| Term | Definition | Dictionary |
|---|---|---|
| Iso | Equal | Ex. iFIT-11 at iFIT APPX 000139. |
| Inertia | A property by which it stays still or, if moving, continues moving in a straight line unless it is acted on by a force outside itself | Ex. iFIT-11 at iFIT APPX 000140. |
| inertial | Connected with or caused by inertia | Ex. iFIT-11 at iFIT APPX 000140. |

### G.    Dispute 7: "moves in a direction opposite said first direction"

| Claim Term and Claims | Streamline | iFIT |
|---|---|---|
| "moves in a direction opposite said first direction"<br><br>'186 patent claim 1. | Plain and ordinary meaning. | Plain and ordinary meaning, i.e., a direction opposite does not mean merely a different direction. |

### 1.    Plaintiff's Opening Position

The '186 patent recites that the "user interface moves in a first direction" and "in a direction opposite said first direction." '186 patent at claim 1. The patent

assigns no narrowing meaning to "opposite," and the prosecution history contains no limiting statement.

Instead, the patent describes the user interface moving "between directions" *id.* at 4:61-64, including "upward" and "downward," *id.* at 9:33-38. This accords with standard definitions of "opposite"—"moving or tending away from." *See, e.g.*, Ex. Streamline-14 at 1237; *see also Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1281-82 (Fed. Cir. 2017) ("It is axiomatic that we will not narrow a claim term beyond its plain and ordinary meaning unless there is support for the limitation in the words of the claim, the specification, or the prosecution history." (quoting *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1333 (Fed. Cir. 2013))).

iFIT embroiders this plain meaning, adding that "a direction opposite does not mean merely a different direction." D.I. 39 at 11. This unhelpful expansion "does nothing to clarify the claim terms" and "adds nothing to the plain and ordinary meaning of the terms." *T-Jat Sys. 2006 Ltd. v. Expedia, Inc.*, No. 16-cv-581-RGA, 2019 WL 3944014, at *7 (D. Del. Aug. 21, 2019); *see also Rosco*, 2012 WL 6028239, at *8 (rejecting proposed construction that "adds unhelpful ambiguity"). iFIT fails to clarify what is "opposite" as opposed to "merely . . . different," muddying an otherwise clear term.

84

Accordingly, iFIT's proposal should be rejected, and the term should be given its ordinary meaning. To the extent iFIT disputes that its accused products' user interfaces move in an "opposite" direction, that is a question for the jury. *See Am. Piledriving*, 637 F.3d at 1331 ("It is well settled that the role of a district court in construing claims is not to redefine claim recitations or to read limitations into the claims to obviate factual questions of infringement and validity but rather to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence.").

### 2.    Defendant's Answering Position

iFIT's construction is intended to ensure Streamline is bound to the true meaning of "opposite" when making its infringement case. The term "opposite" must be bound to the description of that term in the patent. *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998) ("claims may be no broader than the supporting disclosure"). Streamline is attempting to read the language of "direction opposite" to encompass rotational movement and changes to the angle of rotational movement (not the direction). *Plaintiff's Disclosure of Asserted Claims and Infringement Contentions*, Exhibit A at 272.

The term "opposite" is found nowhere in the patent specification and appears only in a single independent claim. As found below, the term should be bound to the only context in the disclosure which may reasonably be connected to the term:

> Reverse Movement
> For the linear movement system 200, resistance profiles were provided for a given direction of movement, such as an upward push on bench press. Through appropriate mounts, pulleys, and the like, the resistance profile of the return movement, such as the downward movement of negative of the bench press, is also set to any profile. The increased load is optionally set as a percentage of the initial, static load. For example, the downward force profile of the bench press are optionally set to match the upward resistance profile, to increase weight, such as with a an increased weight "negative" bench press, or to have a profile of any permutation and/or combination of all or parts of the listed profiles.

'186 patent at 9:32–44.

The above disclosure is directed to the "linear movement system" encompassed by weight systems such as a bench press, not a rotational movement system such as an exercise bike. In the context of the patent, the user pushes the bench press up in one direction. Then, the user lowers the bench press in a reverse (or opposite) direction. The user follows this same sequence of motions.

As explained above, a bike and a bench press are fundamentally different types of exercise at least with respect to the type of movement. With respect to opposite movement, the '186 patent only contemplates "reverse movement" in the

86

context of linear movement[16], such as a bench press exercise, and does not contemplate "reverse movement" in the context of rotational movement.

Even if it could be argued that the claim language for "opposite direction" *does* contemplate or encompass rotational movement, the opposite direction of rotational movement would be a plain and ordinary understanding, *i.e.* clockwise vs. counterclockwise.



Streamline's infringement contentions seek to capture different angles of the same clockwise rotational movement as "opposite direction" because the pedals "move up and down" while the bike inclines to simulate uphill terrain as shown below.

---

[16] "Herein the linear movement system refers to a linear, about linear, or **non-rotational movement**." '186 patent at 6:58–59.



Ex. iFIT-9 at iFIT APPX 000127 (*Plaintiff's Disclosure of Asserted Claims and Infringement Contentions*, Exhibit A).

Instead of a natural understanding of what movement in an "opposite direction" means for "rotational movement." Streamline seeks to introduce infinite "directions" that are all "opposite" of each other while the user pedals, simply because the angle of the bike changes to simulate the feeling of climbing a hill and because the user's pedals move "up and down."[17]

For the reasons discussed above, iFIT's construction should be adopted so that the plain and ordinary meaning governs the infringement case going forward.

---

[17] Even then, the user interface of a bike does not move in an "up and down" direction. Rather, the pedals rotate in a circular motion, traveling along every point of a 360 degree circle.

88

### 3.    Plaintiff's Reply Position

"Opposite" should be construed to have its plain and ordinary meaning, i.e., the claimed first and second directions tend away from each other. *See supra* § III.G.1; Ex. Streamline-14 at 1237.

iFIT does not dispute that the '186 patent uses "opposite" in this ordinary sense. *Supra* § III.G.2. iFIT does not even dispute that the specification identifies "upward" and "downward" as "opposite" directions—consistent with an ordinary understanding of the term. *Id.* (citing '186 patent at 9:32-44).

iFIT, however, insists that "a direction opposite does not mean merely a different direction." *Id.* iFIT fails to explain what is "opposite" as opposed to "merely . . . different." It appears to argue that any variation in rotational movement (or perhaps, any variation other than clockwise and counterclockwise movement) is "merely different." *See id.*

iFIT provides no support for this assertion. The most it musters is the strained contention that because the '186 patent describes a bench press moving "upwards" and "downwards," the patent "only contemplates 'reverse movement' in the context of linear movement." *See id.* iFIT assumes that a POSA would be unable to fathom the concept of "opposites" without a detailed description. But regardless, the '186 patent expressly teaches that "elements of the linear movement system . . . apply to a rotational movement system." '186 patent at 10:25-29.

iFIT's primary argument is noninfringement, not claim construction. It insists that its accused bikes lack a user interface that "moves in a direction opposite said first direction."[18] *See supra* § III.G.2. This dispute, however, is for the jury. The question of infringement should be decided based on evidence and expert testimony, not iFIT's attorney argument. *See Am. Piledriving*, 637 F.3d at 1331 ("It is well settled that the role of a district court in construing claims is not to redefine claim recitations or to read limitations into the claims to obviate factual questions of infringement . . . ."); *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1367 (Fed. Cir. 2008) ("[I]t is not appropriate for the court to construe a claim solely to exclude the accused device.").

### 4.    Defendant's Sur-Reply Position

Streamline claims that iFIT provides no support for iFIT's construction, that "opposite does not mean merely a different direction." iFIT provides dictionary definitions below which support iFIT's construction.

| Term | Definition | Dictionary |
|------|------------|------------|
| Opposite | On the other side of a particular area from sb/sth and usually facing them; | Ex. iFIT-11 at iFIT APPX 000138. |

---

[18] Though irrelevant to claim construction, iFIT is incorrect. "Incline" and "decline" are clear opposites, and in addition, both the x-y-z position of the "user interface" (pedals) and the rotational angle of the user interface vary in opposite directions when the pedals of the accused bikes move from the inclined to the declined position.

| | | |
|---|---|---|
| | ***As different as possible*** from sth | |
| Opposite | Situated on the other or further side;<br><br>***Completely different***;<br><br>Being the other of a contrasted pair | Ex. iFIT-12 at iFIT APPX 000144. |

Opposite may not be "merely different" but must be "as different as possible" and/or "completely different." With respect to rotational movement, opposite directions are shown below:

The key is in the simple definitions provided by iFIT: opposite means being the other of a contrasted pair. The contrasted pair for clockwise rotational movement is counterclockwise rotational movement. Any minor change in movement (e.g., linear movement generally in the same direction but in a slightly different plane, shown below) is not what is contemplated by the claim.

ME1 39227200v.1







ME1 39227200v.1

## IV.    Conclusion

### 1.    Plaintiff's Opening Position

For these reasons, Streamline requests that the Court construe the disputed claim terms in accordance with Streamline's proposed constructions.

ME1 39227200v.1

MCCARTER & ENGLISH, LLP

/s/ Alexandra M. Joyce
Michael P. Kelly (#2295)
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
mkelly@mccarter.com
dsilver@mccarter.com
ajoyce@mccarter.com

OF COUNSEL:

Robert F. Shaffer
Jason L. Romrell
Cara E. Regan
Jonathan Fagan
FINNEGAN, HENDERSON,
FARABOW, GARRETT &
DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Megan L. Meyers
FINNEGAN, HENDERSON,
FARABOW, GARRETT &
DUNNER, LLP
271 17th Street, NW, Suite 1400
Atlanta, GA 30363-6209
(404) 653-6400

RICHARDS, LAYTON & FINGER, P.A.

/s/ Christine D. Haynes
Frederick L. Cottrell, III (#2555)
Christine D. Haynes (#4697)
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
haynes@rlf.com

OF COUNSEL:

Taylor J. Wright
Alexis K. Juergens
Ray Nelson
Foley & Lardner LLP
299 South Main Street, Suite 2000
Salt Lake City, UT 84111
(801) 297-1850

*Attorneys for Defendant/
Counterclaim Plaintiff iFIT, Inc.*

94

Luke H. MacDonald
FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER,
LLP
1875 Explorer Street, Suite 800
Reston, VA 20190-6023
(571) 203-2700

*Attorneys for Plaintiff/ Counterclaim
Defendant Streamline, LLC*

Dated: January 18, 2022

95